## SAMUEL L. RYAN v. J. N. MILLER et al., Appellants.

### Division One, July 12, 1911.

1. **FRAUD AND DECEIT: Suit in Equity.** An action to rescind a contract for fraud and deceit is one in equity, not one at law.

2. **———: Remedies: At Law and in Equity: Damages.** In a case of fraud and deceit, growing out of the sale of certificates of stock in a corporation, based on a belief that the corporation was fraudulently organized and the sale was induced by false representations of the corporation and its agents, plaintiff who bought the stock has two remedies: first, he can stand upon his contract, and sue for the damages growing out of the fraud and deceit practiced upon him in the procurement of the contract; or, second, he can elect to rescind the contract, and sue to have the same canceled and for naught held. Of the two remedies, the first is at law, and the second in equity. The measure of damages is different, and the forum is different. In the action at law, plaintiff can recover the difference between the full value of the stock sold to him as its value would have been had it measured up to the representations, and its real or actual value. In the action in equity, the court simply places the parties where they were before the vitiated contract was made.

3. ————: **Maintenance: Coupling Suits: Assignment of Right to File Bill in Equity: To Plaintiff by Other Parties of Right to Rescind Contract.** Plaintiff, who sues in equity, by an action of fraud and deceit, to have rescinded and canceled his contract for the purchase of certificates of stock, alleging he was induced by the false and fraudulent representations of the corporation and its agents to buy them, cannot join with his suit an action for other stockholders similarly situated who have not sold their stock to him, but assigned it to him for the sole purpose of permitting and authorizing him to sue in his own name for their benefit. An assignment by others of a mere naked right to file a bill of equity to rescind a contract of the purchase of stock for fraud, is void, is condemned by public policy, and does not authorize the assignee to maintain a suit in his own name for the assignors. The bare right to complain of a fraud is not a vendible chose in action. An assignment of the mere naked right to file a bill in equity to rescind a contract for fraud savors of the character of maintenance.

4. ————: **Sale of Corporate Stock: Horse Racing and Betting: Suit to Refund.** Where a corporation was organized under the laws of a foreign State for the purpose of purchasing horses and engaging in horse-racing and book-making; where one-half of its capital was paid up in money and horses and issued to the organizers, and plaintiff bought a part of the other half at par, knowing full well the purposes for which the company's capital was to be used; where the company at first did well in a financial way, and paid not to exceed four per cent dividends per week, until the entire dividend paid stockholders amounted to thirty per cent; where plaintiff retained that dividend, and made no complaint of fraudulent representation until misfortune overtook the company, due to bad tracks, to the horses becoming diseased, and to the public bettors rather than the company's book-maker picking the winning horses; where there is no proof that the defendant managers of the company appropriated the profits or used the capital to pay dividends; where the material representations of facts in the company's prospectus and those of its agents, are shown to be true by plaintiff's own evidence, though that evidence be the depositions of defendant organizers, plaintiff's suit to rescind the contract of purchase and to recover the difference between what he paid for the stock and the dividends paid, should be dismissed, or nonsuit required.

5. ————: **Court of Equity: Gambling Enterprise: Plaintiff's Knowledge of Fraud.** If plaintiff knew that the corporation's capital was to be used in horse-racing and book-making, and

236 Sup.—32

he bought its stock knowing that fact, he cannot complain, if when the company applied the capital to that purpose, the gambling venture did not turn out to be profitable, but resulted in loss to its organizers and managers, and a court of equity will not hear his prayer to compel them to redeem his stock.

Appeal from St. Louis City Circuit Court.—*Hon. Matt G. Reynolds,* Judge.

REVERSED AND REMANDED *(with directions).*

*Martin L. Clardy, James F. Green,* and *Henry S. Shaw* for appellants.

(1)    Plaintiff cannot question the validity of the incorporation of the Miller Company in this action, and, whether one or more of the incorporators failed to sign the articles, does not affect the validity of the incorporation.   Bank v. Rockefeller, 195 Mo. 15; Webb v. Rockefeller, 195 Mo. 57; Haskell v. Worthington, 94 Mo. 560.   (2)    Nor can plaintiff claim that the Miller Co. was acting outside its charter powers.   The question of *ultra vires* can only be raised by the State. Drug Co. v. Robinson, 81 Mo. 18; Bank v. Trust Co., 187 Mo. 535.   And, if the officers of the corporation engaged in gambling, they did not violate any law of South Dakota or Missouri, since the gambling was done in Louisiana.   Further, plaintiff and his associates, having accepted the proceeds of the transaction, are in no position to complain.   Express Co. v. Reno, 48 Mo. 264; Knapp v. Knapp, 118 Mo. App. 705; Fair Association v. Carmody, 151 Mo. 561; Ullman v. Fair Association, 167 Mo. 273.   (3)    None but creditors could complain of the value of the property of the corporation, in a proper proceeding against defendants, as stockholders, for unpaid stock, as property may be subscribed for the stock of a corporation. Vogeler v. Punch, 205 Mo. 573; Woolfolk v. January, 131 Mo. 620; Van Cleve v. Berkey, 143 Mo. 109.   (4)

Whenever property of any kinds depends for its value upon contingencies, opinions as to its value must necessarily be of a speculative character, and no action will lie for mere expressions or opinions as to value. Brown v. Zinc Co., 231 Mo. 166; Wilson v. Jackson, 167 Mo. 135; Cornwall v. Real Estate Co., 150 Mo. 377; Gordon v. Butler, 105 U. S. 553; Holbrook v. Connor, 60 Mo. 578; Barnard v. Coffin, 138 Mass. 37; 1 Bigelow on Torts, 472; Harrison v. Walden, 89 Mo. App. 164. (5) The assignment of the stock certificates to plaintiff Ryan is void. No consideration was paid for the certificates, and the only purpose of the assignment was to enable plaintiff to maintain this suit. Wilson v. Railroad, 120 Mo. 58; Haseltine v. Smith, 154 Mo. 412.

*Kinealy & Kinealy* for respondents.

(1) The plaintiff and other purchasers of any of the 25,000 shares of stock acquired by Miller and Givens, and which plaintiff and other purchasers were induced to purchase from defendants by fraud and fraudulent pretenses of defendants, may recover the money paid for that stock and not returned, by an action at law in the nature of assumpsit. 8 Ency. Pl. & Pr. 887. (2) The purchaser of any of the 11,000 shares sold which had not been previously issued or subscribed for, and who had been induced to purchase them by fraud and false representations of the defendants, may recover the money paid by him, from defendants, if the corporation was created under circumstances that made its incorporation a fraud on the State of South Dakota, in which it was incorporated, and on the State of Missouri, in which it did business and was in fact intended to act, because it is not a corporation in Missouri. Hobbs v. Boatright, 195 Mo. 693; State ex rel. v. Cook, 181 Mo. 610; Davidson v. Hobson, 59 Mo. App. 130; Cleaton v. Emory, 49 Mo.

App. 345; Tribble v. Halbert, 143 Mo. App. 527; Pollard v. McKenney, 69 Neb. 742.  (3)   The circumstances that led to the incorporation of the J. N. Miller Co., and the purposes for which it was incorporated made the incorporation a fraud on the State of South Dakota and on the State of Missouri.  Cases under points 2, 4 and 7.  (4)   The parties plaintiff and defendant in this case are not *in pari delicto* and it is no defense to this suit if plaintiff or his associates knew that defendants intended to use the money paid for stock in betting on horses in 1903.  Hobbs v. Boatright, 195 Mo. 693; In re Arnold & Co., 13 Am. Bankruptcy Rep. 323; Timmerman v. Bidwell, 67 Mich. 205; Green v. Corrigan, 87 Mo. 370; Poston v. Balch, 69 Mo. 121; Wright v. Stewart, 138 Fed. 905.  (5) The assignments of claims to plaintiff Ryan were not void.  Ins. Co. v. Smith, 117 Mo. 291; Chouteau v. Boughten, 100 Mo. 406; Baker v. Crandall, 78 Mo. 584.  And the assignee must sue in his own name. Snyder v. Railroad, 86 Mo. 613.  (6)   The plaintiff is not required to pay to defendants the money received by him or his assignors before bringing suit. Tapley v. McPike, 50 Mo. 592; Clark v. Clark, 59 Mo. App. 535.  Besides a right of action accrued the instant each sale was made.  Those payments are strictly matters for counterclaims and none have been pleaded, but plaintiff and his assignors are nevertheless willing to have those payments deducted.   (7) The incorporation of the Miller Co. was a fraud on the State of South Dakota and of Missouri and therefore void, and defendants become liable for any fraudulent sales of the 11,000 shares of corporation stock not subscribed for but alleged to have been sold by them after the sale of the 25,000 shares allotted to Miller and Givens.  S. D. Stat. 1899, secs. 3812, 3828, 3855, 4209 and 7685; and cases under points 2 and 4.  (a)   The incorporation of the Miller Co. is a nullity, because the incorporators, and Miller, for

whom they acted, intended to violate the civil and criminal laws of South Dakota. State v. O'Brien, 74 Mo. 549; State v. Doerring, 194 Mo. 414; and cases under points 2, 4 and 7.   (9)   The evidence plainly shows that appellants' alleged corporation was merely one of the links in a scheme to defraud. State v. Mispagel, 207 Mo. 557.

GRAVES, P. J.—Plaintiff below was first unsuc cessful, the trial court having forced him to a non-suit.   Upon motion being filed the court set aside the nonsuit, and from that ruling the defendants have appealed.   Plaintiff styles his petition as one "to rescind a contract of sale of stock in a corporation for misrepresentation and deceit."

Defendants in their brief, thus characterize the petition:   "There are many counts in the petition, each of which declares on the amount of stock subscribed by the respective stockholders, and there are likewise many matters of history, conclusions of law and broad conjectures set out in said petition, but the gist of it is an action to recover the amounts of money paid by these parties for their stock.   Whether it is a mere suit at law for money had and received, or a bill in equity to rescind a contract on account of fraud and misrepresentation, is somewhat difficult to determine."

The petition is voluminous and perhaps in a measure subject to the criticism just made by defendants. Plaintiff, Ryan, sues not only on his own claim as a subscriber to the stock of the J. N. Miller Company, a corporation, but he likewise sues upon similar claims assigned to him by other subscribers to the stock of such corporation.   There are ninety-five counts in all, each bottomed upon a purchase of stock in the J. N. Miller Company.   The petition is extremely verbose, but when fairly analyzed, we are impressed with the

idea that it charges fraud and deceit in the sale of stock in the J. N. Miller Company.

The single count of the petition is so long that we feel that a reasonable digest thereof should be substituted for the petition, although where the character of the petition is challenged a copy thereof is at least excusable, if not desirable in an opinion.

The petition is in paragraphs of length and the outline will be given by paragraphs. So outlined, it charges:

In paragraph one, that in certain named states, including Missouri, there are organized societies for the improvement of breeds of horses which offer purses on races which are legal, all of which was known to the plaintiff and the other subscribers of stock in the J. N. Miller Company, and that defendants entered into a conspiracy to cheat and defraud the public, including the parties involved in this case.

In paragraph two, that defendants Miller and Givens had been engaged in the business of racing horses for prizes and betting purposes; that Miller owned several race horses in value less than $400, upon which Miller and Givens lost money; that Miller owned a large amount of property and was reputed to be wealthy in the city of St. Louis, as well as in other parts of the State of Missouri; that about the time of the organization of the J. N. Miller Company numerous ''get-rich-quick'' concerns were in operation, and it was generally believed by the public that large profits could be made out of such concerns, and the public was anxious to invest in such enterprises; that defendants Miller and Givens resolved to organize such a corporation or concern, and selected defendant Kahn, who was known as a suitable person, to write false and deceiving circulars for such an enterprise, and that thereupon the said defendants Miller, Givens and Kahn entered into a conspiracy and devised a plan, set out in the pleadings in this language: ''That

to give semblance of legality to the enterprise they would incorporate under the laws of Dakota for the ostensible purpose of breeding horses and making money by so doing and by their use, with a capital stock of fifty thousand dollars, a large portion of which would be paid for by a transfer of said horses of defendants Miller and Givens, and would issue certificates of stock to an unlimited amount, ostensibly as the stock of said corporation, to be divided amongst the said conspirators and sold to the members of the general public, who were to be induced to buy the same by false representations as to the legality or great profits of such a business, and by representations of the great wealth and excellent reputation of defendant Miller and the improbability that such a man would be connected with any swindling or fraudulent scheme; that defendant Dees was a railway conductor and well acquainted with defendant Miller, and possessed of some money and property; and the details of the intended scheme and conspiracy were communicated to him by defendants Miller, Givens and Kahn, and he thereupon agreed to enter into said conspiracy.''

By paragraph three it is charged that the corporation was organized by virtue of the conspiracy aforesaid, and the articles of association are set out, the material portion of said articles being the second and third clauses thereof, which read:

''Second. The purpose for which this corporation is formed is to establish and carry on the business of breeding and raising thoroughbred horses, to buy and sell race horses and other thoroughbred horses, to handle all kinds of horses and to carry on any business in connection with the foregoing objects which may seem directly or indirectly conducive to the interests of the company; to purchase, lease or otherwise acquire lands or buildings for the erection and establishment of stables and other buildings and other properties which this corporation may from time

to time find to be for its advantage and purpose and to conduct other enterprises which can be conveniently carried on by this corporation in connection with any of its objects and not in conflict with the laws of South Dakota; to carry on business in any other state or in any part of the world; to hold meetings, transact business and keep such books as may be necessary outside the State of South Dakota, providing however, that nothing is done inconsistent with the laws of South Dakota.

"Third. The place where the principal business of this corporation shall be transacted is Huron, in the county of Beadle, State of South Dakota, but a business office may be located at city of St. Louis, where meetings of the directors and stockholders may be had for the transaction of business."

By paragraph four it is charged that in pursuance of such conspiracy and as a part of the scheme defendants opened an office in the city of St. Louis, issued a large quantity of blank certificates of stock and procured agents to sell the same under false representations afterwards set out in the petition.

In the fifth paragraph and some succeeding paragraphs of the petition, these alleged false statements are set out. The principal one is in the fifth paragraph and reads: "Plaintiff further states that immediately after said certificates of incorporation were issued defendants, in pursuance of said conspiracy, issued public notices and prospectuses, and published and largely circulated advertisements in the leading newspapers in the city of St. Louis and other cities not known to the plaintiff and throughout the State of Missouri, in which they falsely and fraudulently announced and declared to all persons that the corporation known as the 'J. N. Miller Company,' being said corporation, was a corporation of wealth and means and was backed by defendant Miller, a man of immense wealth and unimpeachable integrity; that

said corporation had invested $25,000 for capital to operate on; and further in pursuance of said conspiracy, falsely alleged and stated that over $5,000,000 was offered annually in such purses and that owing to special facilities and privileges so possessed by said corporation, which they did not more fully explain, said corporation would obtain enormous sums as winners of such purses and would distribute such sums among the subscribers to the stock of said corporation, of which fifty thousand shares at the rate of one dollar per share was for sale; and plaintiff states that by reason of false representations and statements, and relying upon their truth, a large number of persons, who saw advertisements, notices and prospectuses, were induced to buy over one thousand of said shares of stock at said price of one dollar per share and pay for the same to defendants, whereby they obtained over $100,000 in cash, all of which was divided amongst the defendants, as, and as soon as, received, but the defendant Miller retained the largest amount."

By the sixth paragraph it is charged that defendants falsely pretended to have purchased certain horses from Miller and Givens at the price of $25,000; and falsely stated and advertised that such horses were first class race horses and sure winners of the purses described as aforesaid, and that such horses were cheap at the price.

By the seventh paragraph it is charged that these sales of stock extended over a period of several months, and that during such term in pursuance of their fraudulent scheme and design and to sell further and other stock, defendants returned to the purchasers of stock about three per cent thereof as dividends, falsely claiming that such had been earned and obtained by the corporation by purses won by the horses as aforesaid.

By paragraph eight it is averred that the horses pretended to have been bought from Miller for $25,000 were not good race horses, and were not worth more than $2000, and "were purchased by the defendants for the fraudulent purpose of inducing the public to believe the other false and fraudulent representations aforesaid of defendants, and that they really intended to compete for said purses and divide them amongst so-called stockholders."

In paragraph nine plaintiff alleged that no capital stock had been paid up at the time of the incorporation of the company nor for a long time thereafter; that the company had no place of business in South Dakota and did no business and never held a meeting in said State, and the incorporators of said company never had any intention of doing business in South Dakota, but that said incorporation and organization in South Dakota was done with the fraudulent purpose of cheating and defrauding people of other states, including the plaintiff herein; that the money paid by plaintiff and others to defendants for said pretended stock has been spent and lost, and that the pretended officers of said company are wholly insolvent, and that defendants although requested by plaintiff and the other purchasers to repay the amounts given for said pretended stock have wholly failed to repay any part of it.

In paragraph ten of the petition it is averred that soon after the distribution of notices, advertisements and announcements of defendants, plaintiff was advised by defendant Dees to invest money in said pretended enterprise; that defendant Dees assured plaintiff that such representations and promises of defendants were true, and plaintiff, relying on and believing in them and in the assurances of Dees, paid to defendants, through Dees, who was their authorized agent, the sum of $500, and also paid them, through another agent, one William Moss, a further sum of $1500, and

received from defendant Kahn four certificates, each for 500 shares of said pretended stock; that afterwards, plaintiff, discovering the fraudulent nature of defendant's enterprise and of their acts, tendered to defendant the 500 shares of stock and demanded the repayment of his money which was refused.

The above fairly outlines the exceedingly long petition in the case. The several counts differ only in the amount claimed. There is contained in all of the counts except the first an averment of assignment, in this language: "Plaintiff further states that afterwards, on the 27th day of April A. D., 1903, said Vogel transferred and assigned to plaintiff all his claims and demands, legal and equitable, of every nature and description against defendants, including his claims and demands arising out of the matters hereinbefore set forth, for collection, for his use, and delivered to plaintiff the said 300 shares of said pretended stock to be tendered again to defendants, and plaintiff now tenders said 300 shares of said stock to defendants and prays judgment against them for said sum of three hundred dollars, with interest."

We quote this because the sufficiency thereof is challenged, along with a challenge to the whole petition.

The answers make certain admissions and denials, but are sufficient to put in issue all the matters pleaded by plaintiff, if plaintiff had in fact stated a cause of action. In addition the answers plead some new matter, which, if required, can best be noted in the course of the opinion along with the points made by counsel. The evidence can likewise be so considered. The reply placed in issue all new matter in the answers. Defendant J. N. Miller answered separately, and the other three defendants answered jointly. For the present, this sufficiently states the case.

I. Plaintiff concedes his action to be one to rescind a contract for fraud and deceit. Defendant is doubtful as to whether it is such an action or an action at law to recover for money had and received. If it is an action to rescind a contract for fraud and deceit, it is one in equity rather than at law. In cases of fraud and deceit the plaintiff has two remedies: (1) he can stand upon his contract and sue for the damages growing out of the fraud and deceit practiced upon him in the procurement of the contract, or (2) he can elect to rescind the contract and sue to have the same cancelled and for naught held. [Brown v. South Joplin Lead & Zinc Mining Co., 231 Mo. 166.]

Of these two remedies the first is at law and the latter in equity. The measure of damages is different as well as the forum. In the first action the plaintiff can recover the difference between the full value of the property, as its value would have been had the property been up to the representations, and the real or actual value of the property, thus giving to the grantee the benefits and profits of his bargain. [Kendrick v. Ryus, 225 Mo. 150.] In the action in equity the court simply places the parties where they were before the vitiated contract was made.

Plaintiff concedes his action to be one in equity to rescind subscription contracts made by himself and others to the capital stock of the J. N. Miller Company. To such case we must therefore apply equitable rules. The case below was tried as a case in equity. Defendants challenge the right of the plaintiff to a standing in equity upon ninety-four of the ninety-five counts of the petition. The allegation of the ninety-four counts upon assigned claims we have set out. It nowhere charges that plaintiff bought the stock of the ninety-four claimants and with it their right to sue upon any assigned equitable action. It nowhere avers as to these ninety-four counts that the plaintiff was undertaking to do more than to come into a court of

equity, and voluntarily or otherwise, secure the equitable rights of these ninety-four claimants. The charge in the petition does not aver a purchase of any of this stock by plaintiff Ryan, and the proof comports with the pleading. The weight of the evidence indicates that these ninety-four parties were to pay to Ryan their proportionate part of the expenses of the litigation, and take their proportionate part of the recovery. Ryan, himself, in a way denied such an understanding, but it is so patent from the other testimony that such was the understanding, it is hardly necessary to discuss his denial.

Remembering that this is an action to rescind ninety-five contracts on the ground of fraud and deceit, the question is, will a court of equity lend its aid to Mr. Ryan on the ninety-four counts in which he has no personal interest. Under the authorities we think not. These parties claim to own no stock to sell or transfer to Ryan. They only claim to have a right of action to rescind a contract of purchase for fraud and deceit, and to that end assign such right of action to Ryan, and deliver to him the shares of stock to be by him tendered back to defendants. Courts of equity will, when the plaintiff comes into court with clean hands, grant him relief, but courts of equity do not undertake to thresh out all the grievances of his neighbors where their grievances are based upon fraud and deceit. In such case the court will inspect the plaintiff's hands, and adjust, if need be, his grievances, but will not undertake to inspect the hands of his numerous neighbors and adjust their grievances.

In the case at bar the parties were abandoning the stock and simply asking to have rescinded their contract of purchase on the ground of fraud and deceit. They had no stock to sell and sold no stock to Ryan. They might have retained their stock and sued at law for damages on the ground of fraud and deceit, but this course they did not see fit to pursue. They

elected to go into equity and must be bound by the rules of equity. What they assigned to Ryan was a mere right to file a bill in equity for them. Thus runs their pleading and thus runs the facts in evidence. They could not have sold and assigned the stock without in a way ratifying the contract, and thus leaving unto themselves only an action at law for damages based upon fraud and deceit. But as seen the action here is in equity, which precludes the idea of the assignment of anything to Ryan, except the naked right to file a bill in equity for them. With this situation there is no question as to the law.

In 2 Am. & Eng. Ency. Law, p. 1024, the rule, buttressed by authority, is stated in the following language:

"The assignment of a mere right to file a bill in equity for fraud committed on the assignor is void as being against public policy and savoring of maintenance.

"*Qualification*. But it seems that this rule, as established by the authorities, applies only to a case where the assignment does not carry anything which has itself a legal existence and value independent of the right to sue for a fraud. It does not apply to a case where such right is merely incidental to a subsisting substantial property which has been assigned, and which is itself intrinsically susceptible of legal enforcement. In such a case the assignee is entitled to maintain an action to set aside a fraudulent conveyance of the property assigned, if his assignor might have done so.".

Whether our own case law goes further than this we need not discuss. We certainly have gone thus far. In land conveyances we may have gone further than the exception above noted by the author quoted. It would seem that our recent cases have in the cases of landed estate followed the doctrine of the common law.

The doctrine of the common law is mentioned by this court in the early case of Smith v. Harris, 43 Mo. l. c. 561, whereat BLISS, J., said: "French et al. v. Shotwell, 5 Johns. Ch. 555, cited by defendant, is also unlike the present case. The grantor had confessed judgment upon a consideration effected by usury, extortion, etc., and, before selling to the petitioner had filed his bill to set aside the judgment, but the matter was compromised and the judgment allowed to remain. The grantee bought the land, knowing the judgment and its lien upon it, and the court held that he could not impeach the judgment, and that even his grantee had put it out of his power to do so. The Chancellor refers to Upton v. Bassett, Cro. Eliz. 445, also cited by this defendant, where the judges state that it is 'a principle of the common law that a fraud could only be avoided by him who had a prior interest in the estate to be affected by the fraud, and not by him who subsequently to the fraud acquired an interest in the estate.' The very gist of the action in the case at bar, as is seen, is the prior purchase and possession of the property affected by the fraud. It has always been held that the assignment of a bare right to file a bill in equity for fraud upon the assignor is void, as against public policy, and savoring of the character of maintenance. [Sto. Eq. 1040; Prosser v. Edwards, 1 You. & Coll. 481; Morrison v. Deaderick, 10 Humph. 342.] The case now under consideration does not, as we have seen, fall under the class of cases cited by the appellant. The plaintiff's right to the property does not depend alone upon the assignment by West. Their purchase, their interest, their possession, were long antecedent to it. The taking a deed from him is not an original purchase, but only a step to protect that purchase, and they should be able to avail themselves of any fraud that renders the deed to Harris invalid."

In Wilson v. Ry. Co., 120 Mo. l. c. 57, this court said: "We think also that the circumstances show that the assignment of these judgments was without other consideration than that plaintiff would prosecute this action. The Burgess judgment, which amounted to $152,000 when revived, stood from May, 1875, to October, 1882, as collateral security for $3000. It was assigned to Hugh Loonan, in whose name it was revived in December, 1887. The judgment was assigned to plaintiff in a few days after the return of an execution thereon, and immediately thereafter this suit was commenced. It does not appear, except from a statement in the petition, that any valuable consideration was paid. The same may be said of the McGinnis judgment. As soon as it was obtained it was also transferred to plaintiff, so far as was shown, without consideration, and was at once included in an amended petition in this case. We are satisfied that this whole proceeding is a mere speculation on the liability of these defendants, as stockholders of said corporation, and that plaintiff is a mere volunteer without substantial or equitable right. It was the duty of plaintiff to have shown his good faith, if he was so acting when it was discredited by so many circumstances. Courts of equity will not lend their aid to assist in the enforcement of legal rights acquired in such a manner. As it has been said: 'It has always been held that the assignment of a bare right to file a bill in equity for fraud upon the assignor is void, as against public policy, and savoring of the character of maintenance.' Smith v. Harris, 43 Mo. 562, and cases cited. 'An assignment which violates the policy of the law against champerty and maintenance, as operating merely to procure or promote litigation, will not be permitted by a court of equity, even though it may not amount strictly to the criminal offense of champerty or maintenance.' [3 Pomeroy's Eq. Jurisprudence (2 Ed.), sec. 1276.]"

In the case at bar there is neither allegation nor proof of consideration. This may not be material, and we do not rule upon the question of consideration. It is at least a circumstance that can be considered by a court of conscience. The point in the case at bar is that there was nothing to be assigned but the mere right to bring a suit in equity. There was no stock to assign, because the purchasers were charging that the contract was void and were tendering the stock back to defendants.

In Haseltine v. Smith, 154 Mo. l. c. 412, the views of this court are thus expressed: "Suppose L. A. Haseltine were the plaintiff here, what could he say that would entitle him to a cancellation of his deed to Smith? But conceding that he could have maintained such a suit he could not assign his right to do so. The bare right to maintain a suit in equity to set aside a deed obtained from the assignor by fraud is not assignable. [Smith v. Harris, 43 Mo. 557; Wilson v. Railroad, 120 Mo. 45; 3 Pom. Eq. (2 Ed.), sec. 1276; 2 Story, Eq. (13 Ed.), 1040g.]"

And in the very recent case of Weissenfels v. Cable, 208 Mo. l. c. 532, we said: "In the first place, if we concede that the naked legal title to tracts 1, 2 and 3 had not passed out of Boone prior to the date of that deed, and if we go further and concede that Boone was defrauded by the execution of that deed to defendant, then the fraud touches Boone alone and the right of action on the fraud is not a vendible commodity to pass from one to another by dicker and sale. The right to sue to set aside that deed was in Boone, remained in him (if anywhere), and did not pass by his subsequent special warranty to plaintiff. [Smith v. Harris, 43 Mo. 557; Jones v. Babcock, 15 Mo. App. 149; Wilson v. Railroad, 120 Mo. 45; Haseltine v. Smith, 154 Mo. 404; Hayward v. Smith, 187 Mo. 464.] The general rule that a subsequent grantee may not

maintain a suit to set aside a prior fraudulent deed from his grantor to another is subject to a main modification, viz.: if such subsequent grantee had a prior, independent, equitable right in the subject of the grant, then he may maintain his bill to set aside the fraudulent conveyance of his grantor standing in the road of clearing up and perfecting his original, prior, independent, equitable right in the subject of the grant. [See cases, supra.]"

It therefore appears that in the conveyances of estates and the incidental assignments of causes of action thereby created, our court has adhered to the common law rule quoted in Smith v. Harris, supra.

So, too, THOMPSON, J., in Jones v. Babcock, 15 Mo. App. l. c. 150, says: "We shall affirm the judgment in this case upon the sole ground that the bare right to complain of a fraud is not a vendible commodity. 'It has always been held,' said BLISS, J., 'that the assignment of a bare right to file a bill in equity, for fraud upon the assignor, is void, as against public policy, and savoring of the character of maintenance.' [Smith v. Harris, 43 Mo. 557, 562.] He cited to the point, Story Eq. Jur., sec. 1040h; Prosser v. Edwards, 1 You. & Coll. 481; Morrison v. Deaderick, 10 Humph. 342, and McMahon v. Allen, 34 Barb. 56, all of which sustain this doctrine, as do other cases. In McMahon v. Allen, supra, it was held that one who has conveyed real estate, and who is entitled to have the conveyance set aside on the ground of fraud, can not so assign his naked right of action that his assignee may sue in his own name. The conveyance is voidable, not void, and the right to avoid it is not an assignable chose in action. Of course, the case is different where the assignment is of something in the nature of property. Here the assignee takes not only the thing assigned, but whatever is necessary to enable him to possess and enjoy the same. Thus we have held that the assignment of a judgment enables

the assignee to maintain a suit in equity against the judgment debtor to set aside a prior conveyance of property in fraud of his creditors. [Lionberger v. Baker, 14 Mo. App. 353.] If the present case does not fall within the rule, then there is no such rule. The case charged, in substance, is that Frances J. Jones and Richard S. Jones, her husband, had made certain conveyances in trust to the defendant, Leicester Babcock, to secure certain debts; that Babcock in 1874, secretly purchased the notes thereby secured, advertised the property for sale, sold the same as trustee, and caused it to be bid in in the name of the *cestui que trust,* but really for himself; that this fraud was not discovered until March, 1880; and that in May, 1880, Frances J. Jones and Richard S. Jones conveyed, by quitclaim deed, their right, title, and interest in the premises thus sold under these deeds of trust, to this plaintiff. What did this quitclaim deed convey to this plaintiff beyond the bare right to prosecute a suit in equity to set aside a trustee's sale on the ground of fraud? That was all the grantors had to convey; and while they could have asserted such a right themselves, they could not assign it to another. It is different from the case where a party is out of possession and another party in possession under a deed which is wholly void, as a deed of married woman which has not been properly acknowledged. Here, no title has passed; but the trustee's sale in question was not void in the sense that no title passed to the purchaser; it was merely voidable at the election of the parties prejudiced thereby, in case they should seasonably invoke the aid of a court of equity to that end.''

We need not discuss further the rulings of this court. If they go beyond the exception stated in the paragraph quoted from 2 Am. & Eng. Ency. Law, supra, it at least appears that we have been recognizing the common law rule. But in the case at bar

under the facts pleaded, and we may add under the facts proven, the plaintiff was the assignee of a mere right to sue in a court of equity. Such an assignment is void. As stated in the rule, public policy condemns such a course. It follows that as to at least ninety-four of the ninety-five counts of the bill there was no right of recovery in plaintiff, and as to them the court *nisi* erred in setting aside its judgment of nonsuit.

II. Whilst the law eliminates a consideration of the merits of the case except as to the count based on the individual claim of the plaintiff Ryan, yet this count requires a short review of the facts and a consideration of the merits.     As to the excluded ninety-four counts, the same evidence applies, and our remarks would likewise be applicable. There is no substantial merit in Ryan's claim, or in those assigned to him. The plaintiff's evidence, which is all there is here, consisted of certain documentary matters, and the oral evidence of himself, F. C. Schine, Benjamin Von Phul and Joseph P. McGrath, together with the depositions of defendants Miller, Kahn, Dees and Givens. This evidence, when fairly considered, shows that the J. N. Miller Company was organized under the laws of South Dakota, because such laws were more favorable than those of Missouri. In the first place, under such laws, not more than half the required stock need be subscribed for at the date of organization. In the second place, the incorporation fees were nominal. The situation of the law gave Miller and Givens, who owned a number of race horses, the right to subscribe to one-half of the capital stock of the corporation (which was $50,000) and pay up the greater portion of such subscription with their horses. It also gave them an opportunity to sell the remaining stock, and use such money in the business of book-making on horse-racing. That the corpora-

tion was legally organized there can be no question. If organized for a fraudulent purpose, the evidence before us fails to sustain that view. This evidence, it is true, comes from the defendants, but plaintiff took their depositions and read such depositions in evidence as a part of his case.

Under the evidence it would appear that Givens and Miller, who had a stable of race horses, conceived the idea that if they could add to their stable other and better horses, and then combine with the racing for purses and premiums, the business of book-making, large sums of money could be made. But to buy horses and get cash upon which to operate the book-making business, required more money, and they fell upon the idea of organizing the J. N. Miller Company, as above stated and for the reasons above stated.

Having organized, the subscribed stock of $25,000 was partly paid up in cash and partly by horses from the Miller and Givens stables. This gave the new concern some cash and a string of six or seven race horses. Miller and Givens had made money in racing their horses the year previous. Upon receiving the charter the company opened an office in the city of St. Louis for the sale of stock. To this end, the parties issued a prospectus. Upon this prospectus and other similar literature the stock was bought and sold. As this prospectus contains the representations, we reproduce the same, with the exception of a long paragraph thereof, explanatory of how the book-making business was carried on, and the prospects of heavy profits from such gambling scheme. The prospectus reads:

> The J. N. Miller Co. is a duly incorporated stock company, organized for the purpose of continuing the business of J. N. Miller & Co., the well-known racing firm, and to enlarge the same by the operation of a percentage book. The capital stock is $50,000, divided into 50,000 shares of the par value of $1 full paid and non-assessable.

Of the capital stock, 25,009 shares have been subscribed by the incorporators and fully paid up. The balance, will be sold at par. This stock will not be advertised nor put on the market for public subscription, but will be limited to the incorporators and their personal friends and acquaintances.

The president of the company, Mr. J. N. Miller, the well-known capitalist and banker, of Dexter, Missouri, needs no recommendations to Missourians. He is the heaviest stockholder, and will devote enough of his time and attention to the affairs of the company to insure its well management and success.

### CAPITAL AND HOW INVESTED.

It is the intention of the company to operate with a cash capital of $25,000, and to invest $25,000 in good, sound serviceable young race horses.

The best horses in the present Miller stable will be retained, but the company will add as soon as possible at least ʌten first-class performers, horses which will be capable of pulling down the big end of the purse whenever entered. The company will also have the services of one of the very best jockeys in the United States.

Operations will commence at New Orleans November ·27th.

### IMMENSE PROFITS IN SIGHT.

The various race tracks in the United States now give away over $5,000,000 annually in purses. Of this large amount $4,000,000 is divided amongst about eight hundred horses, making an average of $5,000 to each horse. The horses will average in cost about $2,000. Their earning capacity therefore is over two hundred per cent annually in purses alone. These are facts of common knowledge and easily verified.

A book with $25,000 capital can easily handle with wages and commissions $5,000 per day. Of this amount the book will retain as its profits an average of 10 per cent or $500. The daily expenses are less then $200, leaving a net profit of over $300 per day or $100,000 annually. These estimates are very conservative. There are several firms in the West which have operated racing stables in connection with their books during the past season that have earned more than the above amount.

### DIVIDENDS.

A small per cent of the, profits will be set aside as a sinking fund for the purchase of horses to keep the stable at a maximum of earning capacity. The balance of profits will be divided amongst the shareholders in regular weekly dividends.

### THE MANAGEMENT.

The stable will be managed by Jas. Givens, who has so successfully trained the horses owned by himself and Mr. J. N. Miller for the past five years. As a trainer Mr. Givens has no peer, which he has repeatedly proved by winning high class races with horses which had shown inferior form in other trainers' hands. Mr. Givens has lately refused several flattering offers to train for some of the heavy turf operators at a large salary.

The booking operations of the firm will be managed by Mr. Frank Dayton, heretofore with the racing and booking firm of Dayton & Co. That he is a capable book-maker he has amply demonstrated by being a continuous winner on the block. He is a practical horseman, and is one of the few book-makers who make it their business to be at the track early every morning and time the horses in their trial workouts. He is considered the best judge of a trial-work in America, and he commanded a handsome salary at this class of work before he commenced booking for himself. Owing to these exceptional qualifications it is safe to predict that the booking operations of the firm will be extraordinarily successful  *   *   *   *   *

[Here follows a description of the book-making business and its profits.]

### TO INVESTORS IN CO-OPERATIVE TURF COMPANIES.

That co-operation in book-making and racing is a legitimate means of earning large profits is proved by the several dividend paying concerns in the West. The J. N. Miller Co. must not, however, be confounded with any of these mushroom organizations of uncertain durability and unreliable management which guarantee to pay only a small per cent weekly of the profits, no matter how large, and give the investor no stock in the enterprise. The incorporation of the J. N. Miller Co. gives each shareholder a legal title to a share of the cash capital, and the property of the company, and insures him his pro rata of the entire profits. We predict that the stock in this company will be worth $2 per share inside of six months.

### A FEW FACTS.

There has never been a failure of a book-maker who has operated a stable in connection with his book.

The four largest winners on the Western turf are book-makers who have owned and operated stables.

The capitalization of the J. N. Miller Co. is very low. It contains not one drop of water. The assets of the company will consist of cash and property to the full amount of the stock outstanding. This will insure dividends a great deal larger than in any other company of like earning capacity. In these days of watered stock investors will appreciate these evidences of square dealing.

Later letters showed the profits which were being paid each week. Some purchasers of stock acted upon these letters as well as the prospectus. They also acted upon alleged oral statements made by the sellers of the stock to the effect that the business was a money-maker, and that Miller, the president of the corporation, was strong financially. There was some testimony to the effect that they thought they could draw out their investment at any time, but in view of all the facts these statements were too unreasonable to merit consideration. Von Puhl, one of the principal witnesses, gave a party five per cent commission to get him stock in the J. N. Miller Company. He was one of the late purchasers and received no dividends. Most of the stockholders received weekly dividends of four per cent and less until they had received some thirty cents on each dollar invested. Finally dividends were stopped and troubles arose resulting in this action.

It is shown in the evidence that for some weeks the business earned money, and with this money so earned paid the dividends which were paid. Plaintiff not only fails to prove the charges of his petition in this regard, but on the contrary shows by the depositions which he introduced that these dividends were in fact paid out of the profits made during the first weeks of the corporation's business upon the race tracks at New Orleans.

As above stated the proof fails to convince one of a sinister motive in the organization of the company.

There is evidence both ways as to the value of the horses put in by Miller and Givens, but even this difference is slight compared with the wholesale charge made in the petition.

That J. N. Miller was a well-known capitalist of Dexter, Missouri, is not denied. That he was the heaviest stockholder at the time of the prospectus is

not denied. That the best horses of Miller's stable were taken for the company as stated in the prospectus is not denied. That Givens was a successful horse trainer is not denied by the proof.

We might take up each statement, in the prospectus and letters (most of which statements are mere statements of opinion), and go through with them, and when the evidence in the record is compared with the charges in the petition, there is a total failure of proof.

The evidence discloses that for a while the business was very successful, but finally misfortune overtook the book-maker, and heavy losses followed. The track conditions were bad, and the betting public picked the winning horses better than the book-maker. How this could be done is thoroughly explained by the evidence. The track and its condition at New Orleans, where the company was operating, are fully explained. The details of this explanation need not be set out. Suffice it to say that it stands unimpeached and as a part of plaintiff's case.

It is further shown that the horses contracted disease and could not work, and that this entailed expense. The evidence put in by plaintiff reasonably accounts for the loss which the company suffered and its failure to pay dividends. At the time these proceedings were begun the corporation owned eleven head of race horses, the value of which under the proof varies, the highest value being something like $26,000. It owed but little in the way of debts. With these facts there is no merit in Ryan's claim or in the other claims.

From the very beginning it was announced that the corporation would use its money to gamble on horse racing. The plaintiff and other purchasers of stock put their money in, knowing that fact. The prospectus announced the fact, and the witnesses all say that they understood their money was to be used

in that way. They were not misled as to the purposes of the corporation. They knew just to what use their money was to be put, and further as sensible citizens must have known the hazards of race-track betting. These parties saw, or thought they saw, big interest on their investment. They were willing that the public should be fleeced for their gain, and yet, if by good fortune the public bettors succeeded in fleecing them, then they ask their associates in the business to return their money and they keep the profits.

A court of equity should wash its hands of a deal of this kind. We are cited to the case of Hobbs v. Boatright, 195 Mo. 693, as authority for this action. That case is authority the other way, when closely read and analyzed. At page 724 of that case VALLIANT, J., said: "If the case at bar disclosed but one transaction, if we should shut our eyes to the other transactions of like character that distinguished the history of this Buckfoot gang, if our whole attention was confined to the scheme entered into by the plaintiff with Wasser and Fisher in Oklahoma and the denouncement at Webb City, we could not say that one was less guilty than the other; it was a scheme of dishonest purpose and there is no justification or palliation of it, and if there was nothing else in the case to make the offense of one more enormous than the other, we would not listen for a moment to the plaintiff's prayer for relief, and if we do listen to him and grant him what he asks, it is not through any consideration of wrongs suffered by him, but in tender consideration for the welfare of that community whose laws have been defied, and whose public morals have been shocked by this gang of bad men and to bring them to the bar of justice."

So in the case at bar; even if we concede all of plaintiff's contention (which we do not) to the effect that the organization of the corporation was a fraud-

ulent scheme, yet the Boatright case is no authority for a recovery in this case. Nor are the other cases cited nearer in point. But in our view of the evidence, no case is made of a fraudulent scheme to defraud purchasers of stock. The scheme was to get money enough together through this corporation to operate the horse-racing and book-making business, to the end that the stockholders through the corporation might fleece the general public. This plaintiff knowingly participated in the scheme and for that purpose became a stockholder. The doors of courts of equity should be closed against all such applicants. Of course in this desire to fleece the betting public the defendants were as guilty as plaintiff, but not more so.

Upon the merits no case was made, and for that reason the court *nisi* erred in setting aside the nonsuit.

The cause is reversed and remanded with directions to the lower court to set aside its order setting aside the nonsuit taken by the plaintiff, and that such court thereupon enter its order overruling the plaintiff's motion or application to set aside such nonsuit. All concur.