MONTICELLO BUILDING CORPORATION, a Corporation, JOHN T. CRAVEN, BERRY P. CRAVEN and EUGENE CRUTCHER v. MONTICELLO INVESTMENT COMPANY, a Corporation, STRAUS BROTHERS INVESTMENT COMPANY, a Corporation, HERMAN S. STRAUSS, Trustee, and MERCANTILE-COMMERCE & TRUST COMPANY, Co-trustee, and BARNETT L. ROSSETT ET AL., Members of Bondholders Protective Committee, HERMAN S. STRAUSS, Trustee, MERCANTILE-COMMERCE BANK & TRUST COMPANY, Co-trustee, and BARNETT L. ROSSETT ET AL., Members of Bondholders Protective Committee, Appellants. —52 S. W. (2d) 545.

Division One, August 5, 1932.

*Greensfelder & Grand, Clark, Boggs, Cave & Peterson, Taylor, Mayer & Shifrin* and *Taylor, Chasnoff & Willson* for appellants.

*Hyman G. Stein* and *Foristel, Mudd, Blair & Habenicht* for respondent.

HYDE, C.—This case, as originally commenced, was a suit for an injunction. In 1925 the Monticello Building Corporation, one of the plaintiffs herein, negotiated a loan of $350,000 through Straus Brothers Company. There was evidence that this company was later reorganized as Straus Brothers Investment Company, which is one of the defendants herein. The purpose of securing this loan was to construct an apartment building, to be known as the Monticello apartments, in the city of St. Louis. To secure this loan the Monticello Building Corporation executed a deed of trust on the apartment building to Herman S. Strauss, trustee, and J. E. Lehman, co-trustee. The deed of trust provided for the appointment of a successor co-trustee upon application to a proper court. It also conveyed to these trustees the fittings and fixtures of the apartment building, provided for a chattel mortgage on furniture, and covered "all the rents, issues and profits of the above described land, property and estates, which are hereby specifically assigned." The loan of $350,000, secured by the deed of trust, was represented by 635 bonds of denominations of $100, $500 and $1,000. The first of these bonds became due July 1, 1927, and matured in increasing amounts each year thereafter until July 1, 1935, when all of the remainder became due. The mortgage provided that one-sixth of the amount of the semi-annual interest should be deposited with a selected depository each month and that one-twelfth of the annual principal payments should be likewise deposited. It further provided for the mortgagor to pay all taxes and the United States Government income tax on the bonds.

In case the mortgagor defaulted in any payments or failed to perform any condition of the deed of trust, it was provided that the mortgagor should, without any notice whatever, forthwith, upon demand of the trustees, surrender possession to them. The trustees were authorized in their discretion without action of any bondholder to take and maintain possession, hold, manage and operate the property and collect the rents therefrom and lease the same "for not exceeding one year in any one instance." The application to be made of revenue derived from so operating the property was specifically set out. The mortgage also authorized the trustees, before having the entire debt declared due and before entry of any decree for foreclosure, to restore the property to the mortgagor upon certain payments and conditions. The mortgage further provided when any default continued for more than "thirty days after written notice thereof to the mortgagor by the trustee or to the mortgagor

and the trustees by the holders of not less than twenty per cent in amount of bonds, hereby secured and then outstanding, specifying wherein such default consists," the trustees might in their discretion without any action of the bondholders, and upon written request of the holders of twenty per cent of the outstanding bonds, should declare the principal of all outstanding bonds immediately due and payable. It also provided that in case of failure or refusal of the trustees to so act, within thirty days after such request of the holders of twenty per cent of the outstanding bonds, that such holders might declare the principal due. Either of such declarations operated to mature all bonds. The mortgage further provided that in case of such default for thirty days after written notice, the trustees might, without the action of any bondholder and without declaring the bonds due, and upon the written request of the holders of 20 per cent of the outstanding bonds, should institute suits in equity or at law deemed proper to enforce the rights of the bondholders and to foreclose. It further provided that in case any authorized legal proceedings be instituted either by the trustees or by the holders of twenty per cent of the outstanding bonds "the court, to which application is made or wherein the same is pending, shall on application of and nomination by the complainant, as a matter of strict right and without regard to the then value of the premises and without regard to the solvency of the mortgagor or the then owner of the premises, appoint a receiver of said mortgaged premises and the rents, issues and profits thereof." The mortgage (Article IX) further provided as follows:

"Section 6. Whenever under the provisions hereinabove contained it shall have become the duty of the trustee to institute legal proceedings upon the written request of the requisite number of bondholders, and upon the deposit or tender of deposit of the requisite number of bonds with the trustees, and upon tender of proper indemnity, and the trustees shall have wrongfully or unreasonably refused or failed to act within thirty (30) days after such request and tender of the requisite number of bonds and proper indemnity, then and in any such case, but under no other provisions hereof have the right to demand action by the trustees, may jointly institute such proceedings in law or in equity as it was the duty of the trustees to institute, but for the benefit of all holders of the bonds and coupons then outstanding. Every holder of any of the bonds hereby secured (including pledgees) accepts action, whether at law or in equity, upon or under this Indenture, is vested exclusively in the trustees, and under no circumstances shall the holder of any bond or coupon, or any number of combination of such holders, have any right to institute any action at law upon any bond or bonds or any coupon or coupons, or otherwise, or any suit proceeding in

equity or otherwise, except in case of refusal on the part of the trustees to perform any duty imposed upon them by this Indenture after request in writing by the holder or holders of at least twenty per cent (20%) in amount of said bonds as aforesaid. No action at law or in equity shall be brought by, or in behalf of, the holder or holders of any bonds or coupons, whether or not the same be past due, except by the trustees or by the requisite number of bondholders acting in concert under the provisions of this section for the benefit of all bondholders. In the event that pursuant to the terms hereof twenty per cent (20%) or more of the bondholders shall have joined in exercising the right to act in lieu of the trustees, the remainder of the bondholders shall have no right to institute any legal proceedings of the same or a similar character for the same default of the Mortgagor.''

Another provision of the mortgage was that in all actions ''the trustees shall be deemed the representative of the bondholders and in no case shall it be necessary to notify any bondholder or to make any bondholder a party to any action, suit or proceeding for the purpose of binding or concluding such bondholder.''

Plaintiff, John T. Craven was the president of the Monticello Building Corporation and plaintiff Berry P. Craven was its treasurer. They executed a personal guaranty of all the bonds secured by the mortgage on the Monticello apartments. In 1928 the Monticello Building Corporation conveyed the apartment building to the Monticello Investment Company, a separate corporation. The Monticello Investment Company executed and delivered to the Monticello Building Corporation a second deed of trust on the property securing the payment of $40,000 and also executed and delivered to it a third deed of trust securing $162,586. Both of these obligations were payable in monthly installments, of both principal and interest, which added a total charge of about $26,000 per year against the income of the building. The revenue could not bear this burden and in 1930 defaults were made on these second and third mortgage payments. Use of the income of the building to make these payments hastened the default on the first mortgage. On April 27, 1931, when the present suit was commenced there remained due on the principal of the bonds secured by the first mortgage $298,000. The taxes due and payable in the year 1930 were then in default. Default had also been made in the deposits for semi-annual interest and principal payments due on the first mortgage July 1, 1931. The income of the building had fallen below the amount required for these deposits and operating expenses.

Plaintiffs' petition set out the first, second and third mortgages and the defaults therein; stated that the trustee, Herman Strauss,

was dead; that Straus Brothers and Lehman were, with others, trying to bring about a default on the first deed of trust (although the petition shows it was already in default by non-payment of taxes); that they were seeking to have the title to the property placed in said parties to permit them to induce the holders of outstanding bonds to accept a refinancing in lieu of the bonds and by foreclosure to deprive and cheat plaintiffs out of the money due them on the second and third mortgages and destroy the equity of the Monticello Investment Company; and that this action would not benefit the bondholders and would be an irreparable financial loss and injury to plaintiffs and defendant Monticello Invertment Company. The petition further alleged that for the purpose of carrying out such a scheme defendants Straus Brothers and Lehman had offered them $10,000 for quit claim deeds from the two Monticello Companies; that there was an unusual depression in the St. Louis real estate market; and that the second and third mortgages and the equity of the owners would be destroyed if there was a foreclosure. The petition further alleged that these defendants had refused to give them any help or assistance toward obtaining extensions of the obligations due and had refused to furnish them a list of the holders of the outstanding bonds; that Lehman, as trustee, was threatening to take possession of the building and would do so unless restrained, which would cause both plaintiffs and the Monticello Investment Company great loss; that the trustees were not acting faithfully and fairly as trustees, but were seeking to take advantage of the depressed financial conditions; that the provisions of the mortgage were unconscionable; and that the trustee and Straus Brothers were trying to bring about a default by taking advantage of them by attempting to prevent an agreement for reduction of the payments or extension of them. The petition also alleged that the trustees and Straus Brothers had failed to account for all of the original loan and for other payments made them and that all of this required an injunction, an accounting and the appointment of a receiver to "hold and preserve the property real and personal until plaintiffs and defendant, Monticello Investment Company can arrange with bondholders for extensions of maturities or any part or all of the same." The petition asked that E. M. Worthington, whose qualifications were set forth, be appointed receiver and further stated:

"That the trustees and Straus Brothers Company have no rights nor interests to serve at this time to protect and are made defendants for the purpose, among others, of the court compelling them as trustees and otherwise to furnish to plaintiffs the list of owners of said remaining bonds outstanding, unpaid and not due to the plaintiffs; that the said trustees and Straus Brothers Company are

not notified of this application or *suit in equity for the appointment of a receiver* because, as stated, they are not interested and have no rights to protect or serve at this time."

Defendant Monticello Investment Company followed plaintiff Monticello Building Company to the courthouse and on the same day filed answer by which it entered appearance and seconded the nomination of Mr. Worthington. The court granted a temporary injunction, appointed no receiver, but issued an order to show cause why a receiver should not be appointed. Hearing on this order was continued from time to time until the events of August 10, 1931, hereinafter referred to. The interest and principal payments due July 1, 1931, were not made.

On July 17, intervener, Eugene Crutcher, filed an intervening petition which alleged some of the facts concerning the mortgage given by the Monticello Building Corporation in 1925; stated that he was the owner of a $500 bond secured by the mortgage; that Herman S. Strauss was dead; and that Lehman was an employee of Straus Brothers and manager of their St. Louis office. The intervening petition then alleged that the intervener had read in newspapers and heard from other sources that Straus Brothers Company was insolvent and its transactions under investigation; that brokerage houses and trustees had, in many instances in collusion with mortgagors, taken advantage of depressed financial conditions to foreclose mortgages and buy in mortgaged property at less than its value and thereby defraud holders of bonds; that, in other instances, they had arranged for bondholders protective committees, which by fraud and deception induced bondholders to allow themselves to be represented by such committees, in order that they might be more easily defrauded, and that this "racket" had become so common that "it is proper for a court of equity to inquire into all kinds of defaults in first mortgage bonds, so that the protection of bondholders may be insured by the appointment of a fair and honorable receiver." The petition prayed the appointment of a receiver "to take charge and control of and to manage the said real estate and property and to cause the same to be disposed of as the court may direct."

On July 23, the intervening petition was amended by setting out more fully the facts concerning the first mortgage and alleging that Straus Brothers and Lehman were doing the things, which constituted the "racket," referred to as being done generally by brokerage houses and trustees in the original petition. The amended petition asked for a foreclosure of the mortgage and for the appointment of a receiver in the meantime. A motion was filed to strike the intervening petition from the files. One of the grounds stated was that it failed to state facts sufficient to state cause of action

and to warrant Crutcher to intervene. It also stated that "the allegations in the intervening petition are contrary and conflicting to the allegations of plaintiff's petition."

The next day of importance in this case was August 10, 1931. From May 13th up until that time, the building had remained in the possession of the Monticello Investment Company, but by agreement the rents, after certain deductions were made, were being turned over to Lehman. On that date the trustees and bondholders' representatives, in accord with them, attempted to get control of the property by resorting to the Federal Court. Lehman, who had gone to the State of Michigan a few days before, executed and acknowledged a refusal to further act as trustee. Herman S. Strauss (the information concerning his death seems to have been erroneous) turned up and filed a suit, in the United States District Court in St. Louis, to foreclose the first deed of trust. This suit was filed on the theory that, Lehman having resigned, Strauss the sole remaining trustee being a resident of Illinois, and the Monticello Companies being Missouri corporations, the Federal Court had jurisdiction. The petition prayed for an injunction to restrain the plaintiffs and intervener from seeking the appointment of a receiver and interfering with Strauss' right and possession of the property. The judge of the Federal Court was absent from St. Louis, but the petition was presented on that day to a Federal Judge at St. Paul, Minnesota, who refused to issue the injunction. That afternoon intervener's attorney, discovering the filing of the suit by Strauss in the Federal Court, went to the judge of the circuit court, before whom this cause was pending, and stated to the court that Strauss had filed a suit in a United States District Court in which he had asked that a receiver be appointed, that foreclosure be had, and that the parties be enjoined from proceeding in a state court. It appears that under an agreement made by counsel, the hearing on the appointment of a receiver was to be held in the circuit court on August 12th. The court, upon this statement and without notice or hearing, immediately appointed a temporary receiver who took charge of the property. The court stated at that time that: "The only reason I do it is that it is in the nature of a fraud on the court." (Asking for the appointment of a receiver in the Federal Court when hearing was to be had two days later on the appointment of a receiver in the state court.) Intervener's attorney had hurriedly read the petition in the Federal Court and inadvertently misinterpreted the allegation contained therein that under the provisions of the mortgage the trustees were entitled to have a receiver appointed. The petition did not ask that a receiver be appointed.

On August 12, 1931, Barnett L. Rossett and six others composing a bondholders' protective committee were allowed to intervene as defendants and file answer in the case. They stated therein that they represented the holders of more than $85,000 of the first mortgage bonds who had deposited their bonds with the committee and that the legal title to these bonds was vested in the committee. (This constituted more than twenty per cent of the outstanding bonds.) Their answer plead the provisions of Section 6, hereinabove set out, and alleged that for this and other reasons the intervener Crutcher had no right to bring his suit. They asked that plaintiffs' and intervener's petitions be dismissed and that the order appointing the temporary receiver be vacated. Intervener Crutcher amended his petition on this date and made Herman S. Strauss a party defendant and summons was issued to him. On the same date, the answer of J. E. Lehman, stating that he had refused to act, was also filed; and a hearing was then had on the question of vacating the order appointing the temporary receiver. Some of the facts brought out at this hearing have already been mentioned, supra. Such additional facts, as we deem material, will be hereinafter referred to in the opinion. The court, after this hearing, took the matter under advisement. Thereafter, on August 29, 1931, the court appointed the Mercantile-Commerce Bank & Trust Company at St. Louis, successor co-trustee, in the place of Lehman. No one questions here its qualifications, impartiality, or integrity.

On September 14, 1931, intervener Crutcher filed his second amended petition, which is his final petition filed. It was alleged, therein, that on June 5, 1931, the United States District Court in Illinois had appointed a receiver for defendant Straus Brothers Investment Company. The petition further alleged certain facts concerning the first deed of trust given by the Monticello Building Corporation and the default thereon; that intervener was the owner of a $500 bond due July 1, 1935; that the trustees in the mortgage were both officers of defendant Straus Brothers Investment Company; and that the bondholders' protective committee was composed of officers and associates of Straus Brothers Investment Company and were dominated by it. It contained many allegations concerning the manipulations of Straus Brothers Investment Company in other cases, through bondholders' protective committees composed of the same persons as here, by which it was alleged that Straus Brothers Investment Company profited and the bondholders were caused great loss. It alleged that the Straus Brothers Investment Company, and others unknown to the intervener, were engaged in a fraudulent scheme and conspiring to profit at the expense of the bondholders in this case and that the trustees, defendants Straus Brothers Investment Company and Lehman were parties to the

conspiracy. (What difference the appointment of a receiver for Straus Brothers Investment Company by the United States District Court at Chicago would make in carrying out this conspiracy does not seem to have been considered.) The further allegations of the petition material here were that plaintiffs Cravens were offered $10,000 for quit claim deeds to the Monticello apartments pursuant to the conspiracy; that the trustee Lehman furnished the Cravens a list of the bondholders for a consideration of $1,000; that the trustees should have proceeded to take possession of the property, after default, in accordance with the terms of the trust deed and applied the income for the benefit of the bondholders; that the property if sold at this time would not bring enough to pay the bonds, but that it is yielding a large and profitable income; that Strauss had brought suit in the Federal Court; that Lehman had refused to act; and that a temporary receiver had been appointed. The petition prayed that Strauss be removed and that new trustees be appointed; that a permanent receiver be appointed; that Strauss Brothers, Lehman and Strauss render an accounting; and that judgment be entered against Monticello Building Company and the Monticello Investment Company for foreclosure of the trust deed, and for the amount due under the trust deed.

On January 18, 1932, the court rendered its decision, in which it refused to vacate the order appointing the receiver and ordered that the temporary receiver be made permanent. Thereafter, on January 21, 1932, Herman S. Strauss and the Mercantile-Commerce Bank & Trust Company entered their appearance and filed motions to revoke and vacate the order appointing a permanent receiver. The bondholders' committee filed similar motions. The court entered orders overruling their motions and all these parties have appealed from the order of appointment.

The original petition wholly failed to state a cause of action. The substance and effect of the complaint made therein by plaintiffs holding second and third mortgages was that the owner of the mortgaged property, already in default on the taxes, could not meet the payments due on the first mortgage July 1, 1931, and wanted extensions of time, reduction of payments, refinancing, and other concessions not provided for in, and directly opposite to, the terms of the contract made by the first deed of trust when the money secured thereby was borrowed. While the relief prayed for was an injunction, the real relief sought was a moratorium. If that was one of the powers of courts, there would no doubt be a great increase of judicial business by reason of applications therefor. It is apparent that the original petition would support neither an injunction nor the appointment of a receiver. This court has reaffirmed, in several recent cases, the well-settled rule that a court of equity has power

to appoint a receiver "only when such appointment is ancillary to and in aid of an action pending for some other purpose, and in which there is a prayer for other and final or ultimate relief which the court has power and jurisdiction to grant" and "absent a cause of action stated in the main case there is no main case pending and the court is without power or jurisdiction to appoint a receiver." [State ex rel. Lund & Sager v. Mulloy, 330 Mo. 333, 49 S. W. (2d) 1; Laumier v. Sun Ray Products Co., 50 S. W. (2d) 640; State ex rel. Kopke v. Mulloy, 329 Mo. 1, 43 S. W. (2d) 806.]

 It is also clear that intervener's original intervening petition stated no cause of action. It alleged no facts, except as to the existence of the first mortgage, applicable to this case. It merely set out the intervener's suspicions concerning all brokers, trustees, bondholders' committeees and property owners, and sought only an appointment of a receiver and an investigation into the motives of all parties connected with this mortgaged property, without alleging that they or any of them had done anything improper. We shall, however, in determining the authority of the court to appoint a receiver herein, consider the intervener's second amended petition. It was the intervening petition before the court when the order making the temporary receiver permanent (which is the order appealed from here) was made. Appellants contend that this petition sets up an entirely new and inconsistent cause of action from that attempted to be stated in plaintiffs' original petition; that an intervener is not entitled to inject an entirely new and inconsistent cause of action for directly opposite relief into a case by intervention; and that therefore intervener has no standing in this cause and the court is without authority to appoint a receiver upon his intervening petition.

We think this contention must be sustained. Intervention is defined as "a proceeding in a suit or action by which a third person is permitted by the court to make himself a party, either joining plaintiff in claiming what is sought by the complaint, or uniting with defendant in resisting the claims of plaintiff, or demanding something adversely to both of them." [Black's Law Dict., 651; 33 C. J. 477; Rocca v. Thompson, 223 U. S. 317, 32 S. C. 207, 56 L. Ed. 453.] If there is a fund, in the custody of the court to be distributed, which each of two parties claim, it is, of course, fundamental that any other party may be entitled to intervene and make a claim to it against both of the original parties. It is also true, that in matters concerning trust relations a *cestui que trust*, who is not a party to an action between a trustee and a third person, may intervene by showing the court that it is necessary to make him a party to protect his interest. In either case, such an intervener might claim against both of the original parties. [21 C. J. 344,

sec. 342.] With these two exceptions the courts strive "to main-
tain the integrity of the issues raised by the original pleadings
and to keep newly admitted parties within the scope of the original
suit. . . . The injection of an independent controversy by inter-
vention is improper. If a person desires to set up a new and in-
dependent claim to the subject matter of the suit it must be done
by an original bill; it cannot be done by an intervening petition."
[21 C. J. 343, sec. 341.] Intervention is foreign to common law
or equity jurisprudence. It is said to have been borrowed from
the civil law whether with or without statutory recognition. The
nearest approach to a Missouri statute on intervention is Section
820, Revised Statutes 1929, which authorizes the court to bring in
new parties necessary to a complete determination of the controversy.
[Zeitinger v. Hargadine-McKittrick Dry Goods Co., 250 S. W. 913.]
However, neither this statute nor general principles of equity
authorizes one, joining with plaintiffs, to inject into an existing suit
an independent, inconsistent controversy, for a directly opposite pur-
pose, by intervention. [Mountain Grove Creamery Co. v. Willow
Springs Creamery Co. (Mo. App.), 202 S. W. 1054; Langford v.
Fanning (Mo. App.), 7 S. W. (2d) 726; Leaver v. K. & L. Box &
Lumber Co., 6 Fed. (2d) 666; Guardian Trust Co. v. Straus, 115
N. Y. Supp. 247; Curtis v. Curtis (Ala.), 60 So. 167; Hutchinson
v. Philadelphia Co., 216 Fed. 795; Hill v. Wilson, 210 Fed. 200,
27 C. C. A. 260.] An original plaintiff cannot change his cause of
action. Why should anyone joining with him have such right?
The original action in this case attempted to state a cause of action
for an injunction. It sought to restrain the trustees in the mort-
gage from taking possession of the mortgaged property. Its pur-
pose was to protect the interest of the property owner and the mort-
gagor, as opposed to the interests of the trustees and mortgagees
(the bondholders), and prevent a foreclosure of the mortgage. The
purpose of the final intervening petition was to take the property
from the owner, wipe out his title, destroy the second and third
mortgage liens, and hold the mortgagor for the debt. It sought a
foreclosure of the mortgage and a personal judgment against plain-
tiff mortgagor. It complained that the trustees violated their trust
because they did not take possession of the mortgaged property. It
alleged that the trustees were unfaithful in giving a list of bond-
holders to plaintiff (which the terms of the trust deed prohibited),
while plaintiff set up that they were acting unlawfully and violating
their duties because they would not do so. However, it seems too
clear for argument that a suit to foreclose a mortgage and obtain
judgment against the mortgagor for the debt is an independent and
inconsistent action from a suit to prevent a foreclosure. Therefore,

intervener has no right to intervene as a plaintiff in this case and inject into it this independent and inconsistent suit. If he had the right to maintain such an action, it would have been only by a separate suit.

We do not overlook the fact that intervener's final petition as drawn might appear to come within the exception, that a *cestui* may intervene in an action between his trustee and another when necessary to protect his interests; this is because intervener's petition carefully avoids all reference to the mortgage provisions which preclude him from bringing an action to foreclose and which define the powers and duties of the trustees and the rights of the bondholders. However, we have more than the pleadings before us. When we look to the evidence of intervener, at the hearing on the vacation of the order appointing the temporary receiver, including the mortgage itself, it appears that intervener cannot maintain at all such an action as he has attempted to inject into this suit. The mortgage prohibits the holder of a $500 bond out of $298,000 of outstanding bonds from maintaining a suit for foreclosure. It restricts the right, in the first instance at least, to bring suit, upon either the bonds or the deed of trust, to the trustees and the requisite number of bondholders. The bondholders who can so act, upon failure or refusal of the trustees, are the holders of twenty per cent of the outstanding bonds. It appears here that the new co-trustee appointed by the court, the original trustee and the holders of more than twenty per cent of the outstanding bonds are in accord upon a plan of action and desire to be permitted to take possession of the property and act, pursuant to their ideas of what should be done, for the protection of all bondholders. Reasonable restrictive provisions, upon the right to take possession of the mortgaged property and to commence foreclosure or other suits to enforce the rights of the holders of the obligations secured thereby, intended for the protection of the majority of widely scattered bondholders and the owners of the mortgaged property from unwarranted actions, are generally given effect. [41 C. J. 882, sec. 1095; 19 R. C. L. 521, sec. 321; Seibert v. Minneapolis R. R. Co. (Minn.), 53 N. W. 1134, 20 L. R. A. 535; Muren v. Southern Coal & Mining Co., 177 Mo. App. 600, 160 S. W. 835; State ex rel. Bowling Green Trust Co. v. Barnett, 245 Mo. 99; Reetz v. Pontiac Realty Co., 316 Mo. 1257, 293 S. W. 382; as to nomination of Receivers, see 19 R. C. L. 319, sec. 95; 41 C. J. 415, sec. 263.] These provisions are at least valid in so far as they deal with remedies provided for in the mortgage, including the right to foreclose. [Reetz v. Pontiac Realty Co., supra.] While no interest is too small to be entitled to the protection of a court of equity, it is neither necessary to such pro-

tection that small interests shall dominate nor essential to justice that they be allowed to unsettle conditions by bringing suits without restriction. Situations might arise and have arisen wherein a court of equity might, upon a proper showing disregard such restrictions, even in ordering foreclosure. [See Brown v. Denver Omnibus Co., 254 Fed. 560, 166 C. C. A. 118; Weir v. Bauer (Utah), 286 Pac. 936.] No such situation has yet been proved to exist here. In this case the complaint is, not that the trustees refuse to foreclose, but that they will foreclose too soon. It is a fundamental principle of both law and equity that, at least in the absence of a showing that a contract was procured by fraud, duress or undue influence, it will be enforced as the parties made it, unless by their conduct they have become estopped or the equities of their positions otherwise are such that they should not be permitted to do so. Courts do not undertake to make new contracts between the parties merely because one of them may later become dissatisfied with the contract he made. The whole plan, contemplated by the trust deed which the parties made, was that in case of default the property should be managed by the trustees named or their lawfully appointed successors; and that they or the requisite number of bondholders should determine such questions as the enforcement of the acceleration clause, the management of the property, the necessity for a receiver, when to restore the property to the owners, and when to foreclose. There has not been a sufficient showing made in this case to justify setting aside these provisions and refusing the trustees and the more than twenty per cent of the bondholders acting with them the rights which this contract gives them.

█ The evidence produced at the hearing in this case also raises another fundamental question in our minds. The intervener had lived all his life in St. Louis. He was engaged in the real estate business. He said he was brought up in the real estate business in St. Louis by his father and had never been in any other business. He was apparently peculiarly in a position to know conditions and to find out what were the provisions of the deed of trust securing the bond which he acquired. The bond itself, which he acquired as part of a real estate commission, referred to the provisions of the trust deed, and was notice of them. [Reetz v. Pontiac Realty Co., supra.] When intervener acquired this bond, around July 1, 1931, the mortgage was already in default, and plaintiffs' original suit pleading the dire financial straits of the mortgagor and owner of the property had been filed. According to his testimony, the property would bring only about one-half of the first mortgage debt on foreclosure. He acquired the bond only a few days before he filed his first intervening petition setting forth his suspicions

concerning all brokers, defaulting property owners and trustees; and alleging the depressed financial conditions of the country in general and St. Louis in particular. This bond was not even due for four years unless it was matured by the acceleration clause of the mortgage which he, as the holder of one $500 bond, was given no right to invoke. He does not claim to have purchased it, at its face value as an investment, believing it to be worth that amount.

Trustees in mortgages and persons acting as members of bondholders' committees, on behalf of widely scattered bondholders who are not in a position to individually protect their own interests, must act with loyalty, fidelity and integrity toward the interests of those they represent. They will be held strictly accountable at law and in equity to the faithful performance of the trust which they assume. They are subject to removal for cause. They will not be permitted to personally profit by taking advantage of those who trust them. If they undertake to do so they will be compelled upon proper action to disgorge ill-gotten gains. However, before intervener here can invoke a court of equity it behooves him to show his own good faith and the equities of his own position. One may purchase a cause of action at law and enforce all legal rights which go with it, but the right to appeal to the conscience of a court of equity cannot be bought or sold. [See Wilson v. St. Louis & Western Railroad Co., 120 Mo. 45, 25 S. W. 527; Haseltine v. Smith, 154 Mo. 404, 55 S. W. 633; Harrison v. Craven, 188 Mo. 590, 87 S. W. 962; Weissenfels v. Cable, 208 Mo. 515, 106 S. W. 1028; Ryan v. Miller, 236 Mo. 496, 139 S. W. 128; 5 C. J. 892, sec. 57; 2 R. C. L. 611, sec. 19; 2 Story's Equity (13 Ed.) sec. 1040-G; 3 Pomeroy's Equity (2 Ed.) sec. 1276; Ryan v. Miller, 236 Mo. 496, 139 S. W. 128.]

We hold that under the pleadings and the evidence herein the circuit court was without authority to appoint a receiver. Its decree appointing a receiver is therefore reversed and the cause remanded with directions to proceed in conformance with the views herein expressed. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.