STATE OF MISSOURI at the relation of EDWIN W. LEE, WAYNE A. LEE, C. W. GAYLORD, ELIZABETH B. SKINNER, and R. E. FUNSTEN COMPANY, a Corporation, on Their Own Behalf and as Class Representatives of all Others Similarly Situated who may Choose to Join or Accept the Benefits Hereof, Relators, v. EUGENE J. SARTORIUS, Judge of the Circuit Court of the City of St. Louis.—130 S. W. (2d) 547.

Court en Banc, July 5, 1939.

*Jacob M. Lashly* for relators.

*J. Porter Henry* and *Roberts P. Elam* for respondent.

CLARK, J.—This is an original proceeding in this court to prohibit respondent as a judge of the Circuit Court of the City of St. Louis from enforcing an order made by said court purporting: to remove the members of a so-called Participation Holders Supervisory Committee, to enjoin them from acting on such committee and to appoint other persons as their successors. The relators are holders of certificates of participation issued and sold by the First National Company and the order now sought to be prohibited was made by respondent during certain litigation in said court concerning said company. The facts with reference to such litigation are set forth in some detail in the case of State ex rel. Caulfield v. Sartorius, decided by this court and opinion handed down on the 5th day of July, 1939. So far as necessary to our determination of the issues in the present case, we summarize the facts as follows:

In 1922 the First National Company, an investment corporation, entered into an agreement with the First National Bank, of St. Louis, whereby the Bank was to act as trustee and hold securities, owned by the Company, in trust to secure participation certificates issued and to be issued and sold by the Company. These certificates were issued in various amounts and the Company agreed to pay interest

on them and redeem them on maturity at the face amount. On May 1, 1933, the trust fund consisted of securities of the face value of $9,715,616.89 and there were outstanding certificates of the face amount of $9,577,503.97. On that date the Company defaulted in its obligations and mailed letters to all certificate holders advising them of the condition of the Company, and requesting that the due date of all outstanding certificates be extended to May 1, 1938. With the letters to each certificate holder was forwarded a proposed extension agreement, executed by the Company, as first party, by certain persons referred to as the Committee, as second parties, and providing that all certificate holders who consented thereto would become third parties.

This extension agreement is quite lengthy. We will attempt to state its substance, rather than set it out in full. After lengthy recitals as to the condition of the Company, it purports to be a contract between the Company and such certificate holders "as shall become parties;" provides for the manner in which any certificate holder may become a party to, or withdraw from, the contract; provides for extension of certificates and for gradual liquidation of the Company; that the Committee shall act *for such holders as may become parties*; that the Committee shall advise with the Company, institute or defend court actions, employ such agents and attorneys as they may deem necessary and fix their compensation, but the Committee to serve without pay other than actual expenses; the Committee is given the right to borrow money and to pledge the certificates of the "parties hereto" as security for such loans; the securities of the Company are to remain with the trustee, the Bank, but the Committee is authorized to consent to the sale or substitution of securities; and the Committee is given the right to extend the life of the committee and fill any vacancies in its membership.

At least seventy-eight per cent, in amount, of the certificate holders assented to the extension agreement in the manner provided therein.

Later a number of suits were filed, against the Bank, the Company and the Committee. In some of the suits it was charged that the Bank had, prior to May 1, 1933, mismanaged the trust and substituted inferior securities for sound ones. After answers were filed, these suits were consolidated and, so far as the record shows, are still pending.

In May, 1938, one Lena J. Smith filed an intervening petition alleging, among other things: that she was the owner of certificates of the face amount of $3,000; that the Committee had been secretly picked by the Company; that it had taken no action to compel the Bank to account for its alleged misconduct; that the Committee took no action to prevent the trustee from making a payment on a debt owed by the Company to the Reconstruction Finance Company (said

debt not being due) instead of distributing the amount to the certificate holders; that the Committee undertook to procure a court decree extending the certificates and reducing the rate of interest through which the Bank and the Company would profit; that the life of the Committee was illegally extended; and the petition asked the court to decree that the life of the Committee had expired and to appoint a new committee; or, if the Court should not be of the opinion that the life of the Committee had expired, then to remove the Committee and appoint successors.

After a hearing, respondent, as judge of said circuit court, found: that the Committee had been named by the Company and was under the control of the Company and the Bank; that while they were not required to be holders of certificates, the original members of the Committee had falsely represented themselves to be such holders, and that rendered them unfit to serve; that the Committee was incompetent and negligent. Thereupon, the court entered a decree removing the members of the Committee, restraining them from further acting on the Committee and appointing five named persons as successors.

There is a controversy as to whether or not the said Lena J. Smith had withdrawn as a party to the extension agreement at the time she filed her petition, but we regard that matter as immaterial. The sole question here is: Did the respondent, presiding over said circuit court, have jurisdiction under the facts to remove the members of the Committee and appoint successors?

Respondent starts with the premise that the members of the Committee are trustees, and then briefs the question of the power of a circuit court to remove and appoint trustees. On his contention that the Committee members are trustees, respondent cites: Monticello Bldg. Corp. v. Monticello Inv. Co., 330 Mo. 1128, 52 S. W. (2d) 545; Parker v. New England Oil Co., 4 Fed. (2d) 392; Carter v. First National Bank, 128 Md. 581, 98 Atl. 77; White v. MacQueen, 360 Ill. 236, 195 N. E. 832. None of those cases touch the question of a court's power to remove members of a committee, of the kind we are here considering; nor do any of those cases hold that the members of such a committee are trustees. In the Monticello case, supra, at page 1142, we referred to a bondholders' committee as being in a class with trustees and said "they are subject to removal for cause;" but the committee in that case had possession of the bonds and claimed to hold the legal title to them (page 1136) while in the instant case there is no allegation or finding that the Committee held any title or interest in the certificates. Besides, the right of the court to remove the Committee was not involved or decided in the Monticello case. In Parker v. New England Oil Co., supra, it was held that when a note holders' committee undertook to promote and manage a plan for reorganization, they thereby "assumed fiduciary relation anal-

ogous to that of promoters or trustees'' and must furnish complete information to the parties interested. Carter v. First National Bank, supra, was not a suit to remove a committee, but to restrain it from exceeding its contract powers. White v. MacQueen, supra, was a suit to remove a trustee named in a deed of trust.

■ In a strict sense, a "trustee" is one who holds the legal title to property for the benefit of another (65 C. J., p. 214, sec. 2; Taylor v. Davis, 110 U. S. 1. c. 335); In a broad sense, the term is sometimes applied to any one standing in a fiduciary or confidential relation to another, such as agent, attorney, bailee, etc. Exact definitions are sometimes difficult (2 C. J., p. 425, sec. 2), but there are important distinctions between a "trustee" and an "agent." Agency is a matter of contract. A person, *sui juris*, has the right to select his own agent; and, so far as his own rights and interests are concerned, he may select an incompetent or negligent, or even dishonest, agent. At least, he has the right to determine for himself the qualifications and character of his agent. A trustee may be, and usually is, selected by some person other than the beneficiary. Of course, upon a proper showing, a court of equity will protect against the misconduct of any fiduciary by whatever name called. But, while courts have the power to construe, enforce, or rescind, contracts, no court has the power to *make* contracts for others. ■ In the instant case, the rights of the Committee must be determined by the terms of the extension agreement. We view that agreement as a contract of agency. By its terms the members of the Committee became agents for the certificate holders; not for *all* the certificate holders, but for only such as became and remained parties to the contract. The plaintiff in the court below did not need to resort to a court of equity to free herself from the contract. She could withdraw according to the method provided in the contract. If that method was inequitable and invalid, a court of equity would afford to her a remedy, but, at the request of one person, the court could not revoke the agency for others nor appoint agents for them against their wishes.

In these views we are sustained by the case of Harrigan v. Pounds, 265 N. Y. Supp. 676. That was a suit to remove the members of a bondholders' committee and appoint successors. At page 685 the opinion reads:

"By the terms of each of the fifteen deposit agreements to which some of the plaintiffs are parties, any party has the right to withdraw in the manner therein specified. None of these plaintiffs has expressed any desire to do so. If any plaintiff feels oppressed by the provisions governing withdrawal, he may sue to be relieved either of that provision or of the entire agreement. That, however, is not what the plaintiffs have done. They sue not only to be relieved personally of their obligations under the contracts, but to have them declared void as to the ten thousand or more other parties thereto, and to have

the court depose the committeemen selected pursuant to the terms of the agreements, to impose new ones upon the parties thereto, and to appoint a receiver of their property. The appellants very naturally say: What is to be said of the rights of the thousand or more other parties to each of these agreements—have they no right to be heard? Are the committeemen with whom they have contracted, and for whom they have expressed no dissatisfaction, to be deposed, and others imposed upon them, without their having a day in court, simply because the plaintiffs are dissatisfied with those committeemen?''

■ Each case must be determined upon its own facts. In this case the extension agreement creates an agency which, in like cases, has been found helpful in securing unity of action by a large number of persons similarly situated. No title, not even the physical possession, has vested in the committee. The contract does not make them trustees; the proof does not show that they have become constructive trustees by their conduct.

In saying that persons may select incompetent or dishonest agents, we do not mean to intimate that there is anything in the record of this case to justify such a charge against the members of the Committee. The *facts* upon which respondent based his general findings of unworthiness are scantily set forth in his decree. It seems passing strange that, if the members of the Committee are so unworthy, seventy-eight per cent and more of the beneficial owners desire to retain them and only a fraction of one per cent are clamoring for their removal.

The learned chancellor acted without jurisdiction. Our preliminary rule was providently issued and is now made absolute. All concur, except *Hays, J.*, absent.