Henry J. KELLER, Administrator With Will Annexed of the Estate of Mary J. Smith, Deceased, Plaintiff-Respondent,

v.

Nell M. COLLISON, Defendant-Appellant,

and

The Southern Missouri Trust Company, a Corporation, Defendant.

No. 8449.

Springfield Court of Appeals.

Missouri.

Oct. 20, 1965.

**730**

Edmund C. Forehand, Horace S. Haseltine, Lincoln, Haseltine, Keet, Forehand & Springer, Springfield, for defendant-appellant.

Richard Farrington, Farrington & Curtis, Springfield, for plaintiff-respondent.

Glenn A. Burkart, Mann, Walter, Powell, Burkart & Weathers, Springfield, for defendant Southern Mo. Trust Co.

RUARK, Presiding Judge.

This is a suit by Keller, (public) administrator of the estate of Mary J. Smith, deceased, against Nell M. Collison, the principal defendant, and the Southern Missouri Trust Company, a technical defendant, in which the plaintiff sought to determine title to certain bank accounts, an injunction against withdrawal of certain accounts, an accounting, and such other and further relief as the court should deem meet and proper. Defendant Collison has appealed from an adverse judgment.

The petition charged that deceased, Mary J. Smith, was the sole owner of a savings account of the value and amount of $10,-123.85 and a checking account of $371.75; that on December 15, 1961, such accounts were transferred so as to make them held jointly and as surviving tenant with defendant Collison. That the accounts were transferred merely for convenience so that withdrawals could be made as necessity and circumstances might require "relative to the condition of Mary J. Smith"; that Mrs. Smith never intended to create an account with the right of survivorship; that Mrs. Smith was physically incapable of taking care of her affairs and that Collison "looked after Mrs. Smith," took her places, paid her bills, ran her errands, and that a confidential relationship existed between Collison and Smith. A temporary injunction was prayed and issued to prevent withdrawals from the accounts.

Defendant Collison's answer asserted that she was a practical nurse, that she had cared for Mrs. Smith on prior occasions; that on *December 7, 1961,* Mrs. Collison began stopping at Mrs. Smith's apartment to assist her and do necessary tasks which Mrs. Smith was unable to do; that on *December 26, 1961,* defendant arranged for Mrs. Smith to enter a rest home where she was thereafter in the exclusive care and control of other persons; that on *December 15, 1961,* (the day the accounts were transferred) Mrs. Smith was mentally alert and capable of handling her own affairs but was physically weak; that the transfer of the two accounts was a free and voluntary act of Mrs. Smith without action or influence of defendant, but that Mrs. Smith did place confidence in defendant because of the aid and assistance which she had rendered. The answer denied all else in respect to the transfers. It did not *specifically* claim that the transfers were for a consideration or by way of gift.

The case was tried on June 8, 1964, and taken under advisement. On October 1, 1964, plaintiff was permitted to amend his petition to conform to proof so as to charge in substance that there was no consideration for the transfer of the funds from sole account to joint; that such transfer was made

by way of gift and by reason of the relationship of trust and confidence and as a result of undue influence and control exercised by Collison and was "void and presumptively void." So far as the record shows there was no objection to this amendment and no request for continuance or opportunity to offer further evidence on the part of defendants; nor does the appellant contend she had no notice of such amendment.[1] On *October 19, 1964*, judgment was given for plaintiff and, after unsuccessful after-trial motion, defendant has appealed.

Mary J. Smith was seventy-three years old at the time of her death. She was a childless widow. The record does not show when the husband died, but we gather from scraps of testimony that it had been within less than five years before. Her nearest kin were two nieces, who did not live in the community and with whom she apparently had little contact. She was obviously frail, suffering from arthritis with pain in her knees, and had difficulty in getting around. Because of this difficulty she had (September 1960) transferred her bank accounts from a bank uptown to another bank which had a branch within a short distance of her apartment. There is no contention that Mrs. Smith was not mentally capable and alert, but the evidence does indicate that she was burdened with her age and frailties and was somewhat dependent upon others. In the last few months of her life she was, on some occasions, forgetful to the extent that she would repeat herself. Her sole assets consisted of a savings account in the approximate principal amount of $10,123.85, a checking account in the approximate sum of $371.75, and a small amount of personal effects.

Plaintiff's witness, Mrs. Gillespie, said she had been a neighbor acquaintance-friend of Mrs. Smith since 1956. She saw her sometimes once a week, sometimes every two or three weeks, but they talked on the phone more often than that. She had assisted Mrs. Smith on various matters, including the transfer of funds from one bank to another; and on at least one occasion she had gone to the drugstore in the night to get medicine for Mrs. Smith. Mrs. Smith had discussed funeral arrangements with her, and indicated that she was dissatisfied with the service which had been conducted for her late husband. Mrs. Gillespie suggested that she call a Mr. Lohmeyer (another funeral director) and have him come out and make arrangements in advance with him concerning her own funeral. Mrs. Smith also talked to her about making a will, and Mrs. Gillespie assisted her in this by calling "an attorney or two" and finally made an appointment to go with her to an attorney's office. At the appointed time, however, Mrs. Gillespie was unable to go, and Mrs. Smith went by cab. From her testimony, and that of others, it is not difficult to surmise that Mrs. Smith was conscious of her infirmities and the inevitability of her death in the not too distant future.

Another friend of Mrs. Smith was the defendant-appellant, Mrs. Collison, who worked for a living as a practical nurse. She worked, at least part-time (probably in the mornings), for a local hospital. Their acquaintanceship had begun some five or six years prior to the events with which we are now concerned, when at a market Mrs. Smith appealed to Mrs. Collison and her two young sons to carry some groceries for her. After that, Mrs. Collison did various things for Mrs. Smith. Plaintiff's witness Mrs. Gillespie, who cannot be considered as friendly to defendant, testified that she knew that Mrs. Collison "came by occasionally" and took her (Mrs. Smith) to pick up groceries and "different things." She, Mrs. Gillespie, did not know Mrs. Collison personally, but Mrs. Smith would comment to her that Mrs. Collison had taken

1. V.A.M.R. Civil Rule 55.53; Pender v. Foeste, Mo., 329 S.W.2d 656(4); Simon v. S. S. Kresge Co., Mo.App., 103 S.W. 2d 523(2); Rubbelke v. Aebli, Mo., 340 S.W.2d 747(6–8).

care of Judge Gideon before he passed away, "and she was commenting that Mrs. Collison wanted to take care of her because she was working to the Baptist Hospital and she could give her shots and take care of her as good as a doctor, and there was no use in having a doctor." The record does not establish when this conversation took place; and there is a dearth of direct evidence as to just what Mrs. Collison did for Mrs. Smith prior to December 7, 1961.[2] There is evidence that for a considerable period of time prior to Mrs. Smith's fall and injury (to be hereinafter mentioned), Mrs. Collison was at the Smith apartment "almost every week," and her son testified that he himself sometimes ran errands for her, such as carrying groceries, taking soiled clothes to the laundromat, and cleaning up the apartment when the Smiths moved (this must have been while Mr. Smith was yet alive). For these errands and odd jobs he was paid in "small change." This is as nearly as we can present the situation prior to the matters here involved. A chronological statement of events follows.

Sometime after Mrs. Gillespie had suggested that Mrs. Smith should see Lohmeyer, the undertaker, Mrs. Smith, accompanied by Mrs. Collison, went to see Lohmeyer about arranging her funeral. Lohmeyer was a friend of Collison, "having been in her family four or five times." Mrs. Smith informed Lohmeyer that she was not satisfied with the service which had been given at her husband's death and expressed a preference for a private funeral or burial service, with no display. No contract was entered into at that time; but later, on *July 14, 1961,* Mrs. Smith returned. There is no evidence that Mrs. Collison or any other person accompanied her at that time. She then and there entered into a written contract providing for a "private service" to cost $885.25. Lohmeyer said that Mrs. Smith told him that Mrs. Collison was about her only

friend. He also said that at this time Mrs. Smith was mentally alert, but she was frail and had arthritis.

On *November 2, 1961,* Mrs. Smith went to the office of the attorney whom she had discussed with Mrs. Gillespie and had drawn, and executed, her last will and testament. By this will, Mrs. Smith cut off her two nieces, her nearest kin, with a bequest of one dollar each, and the entire estate was bequeathed to two young men, apparently not of kin and not otherwise mentioned in the evidence. In this will she requested that Mrs. Collison be appointed executrix.

On *December 7, 1961,* Mrs. Smith fell and injured herself. The injury was apparently to her back. There seems to be no question that, after this occurrence, Mrs. Smith was in need of care and that Mrs. Collison was at the Smith apartment for a portion of every day. The undisputed evidence was she got (at least) some meals, and cared for her generally. Her son accompanied her on some of these occasions. Plaintiff's witness, Mrs. Gillespie, testified that during this period she went to the Smith apartment, knocked, got no response and found the door locked. She phoned the Smith apartment and "a party" answering told her, "Well, she [Mrs. Smith] wasn't supposed to have any company."

On *December 12, 1961,* a letter was written to the attorney who had prepared and had apparently retained possession of the will of Mrs. Smith, which had been executed on the previous November 2, 1961. This letter stated:

"This is to notify you on November 2nd, 1961, you made my last will and testament of which I am hereby revoking this said will or any codicils that are on file.

"I request you to send me the will that you have on file."

2. It may be that plaintiff was interested in showing it in order to establish confidential relationship but that defendant shied away from it for the same reason.

This writing of the actual body of the letter was done by Mrs. Collison, as she readily stated to witness Woodruff (see hereafter), but it was signed in ink by Mary J. Smith herself. It is not for this court, on the issues here involved, to decide whether or not this constituted a revocation of that will.

On *December 15, 1961,* Mrs. Collison went to the branch office of the bank and told the teller that Mrs. Smith was indisposed and wanted to make her accounts joint; that she had asked her (Mrs. Collison) to bring her the necessary signature cards. Mrs. Collison took the blank cards necessary to accomplish this purpose and returned the same afternoon with them properly signed showing transfer to Mrs. Smith and Mrs. Collison, joint and survivor. Both of those cards contained (on the back) the fine print "Depositor's Contract" customarily used by banks in such instances.

On *December 26, 1961,* Mrs. Smith was admitted to Mercy Villa, a rest home and hospital for the elderly. Mrs. Collison took her there and made arrangements for her entrance. She, Mrs. Collison, gave her name as "responsible party." She gave her address and phone number with the notation "call afternoon." No other friends or relatives were named. The nurse testified that Mrs. Collison directed that Mrs. Smith should have no visitors, although we do not find that direction on the hospital record. The doctor's findings of December 27, 1961, listed Mrs. Smith's mentality as "generally fair but ——— [an abbreviation we cannot decipher] confused at times." One knee was larger than the other, and there was a foot drop. Tentative diagnosis was "Old C.V.A. and arteriosclerosis." The nurses' record shows that Mrs. Smith was complaining of back pain and that she was unable to feed herself. Continued records show that, until *January 5, 1962,* when she died, medicines were given for pain. The patient was frequently nauseated and vomiting. From December 28, 1961, to January 2, 1962, she was conscious and most cooperative. Afterwards she was usually lethargic or in deep sleep, although during a period on January 3, 1962, she was awake and "more alert" and said she felt fine. Mrs. Gillespie testified that she went to see Mrs. Smith at the hospital once, and she "had her back turned to us and she was just laying in bed there." A woman with her informed Mrs. Gillespie that Mrs. Smith could not have visitors.

Graveside services were held for Mrs. Smith. Present were the minister, the pallbearers, Mrs. Collison and her son, and a Mr. and Mrs. Holland. No one else appeared, and no one was turned away. Mrs. Gillespie testified she called Mrs. Collison about it and Mrs. Collison told her it was a private funeral and just she and the undertaker were supposed to be there. Mrs. Gillespie may have been incensed about this. She said she was coming anyway; but she did not go because of the weather. She called a Mr. Stinson in Kansas City.

Principal witness for plaintiff-respondent was a Mr. Woodruff, county juvenile officer and an attorney for the plaintiff. In the month of February, 1962, at the request of a niece (of Mrs. Smith) in Kansas City, he made an investigation. He, in company with another attorney, and Mr. Keller, the public administrator, went to Mrs. Collison's home and talked with Mrs. Collison for an hour or so. She seems to have talked freely, frankly, and willingly. She told the inquiring gentlemen that, at Mrs. Smith's request, she had procured and returned the cards effecting the transfer of the accounts as we have heretofore related. He said that Mrs. Collison spoke warmly of her relationship with Mrs. Smith; she was her confidant, looked after her, did her business and paid her bills. He testified that she (Mrs. Collison) repeatedly said Mrs. Smith could not trust other people but did trust her, and had confidence in her, and she advised Mrs. Smith; that after Mrs. Smith entered Mercy Villa she cleaned Mrs. Smith's apartment, to which she had a key, disposed of things, and closed the apartment. She pointed out a television set and a rocking chair in her home which had been the prop-

erty of Mrs. Smith. He said Mrs. Collison explained that Mrs. Smith wanted her to have the television set. He did not recall any mention of the chair. She readily produced and gave to the gentlemen the will which had evidently been returned by the lawyer in response to the letter we have heretofore mentioned. The will which Mrs. Collison produced and gave to the visiting gentlemen did not bear any marks indicating its revocation.

Defendant-appellant Collison's testimony was of course circumscribed and limited by the dead man's statute. She related how she became acquainted with Mrs. Smith some five or six years previously but was not permitted to repeat any conversation. She said she wrote the letter to the attorney, recalling the will, and Mrs. Smith signed it in ink. She said that she gave an order at the hospital for her not to have visitors. She attempted to testify that this was at Mrs. Smith's request, but objection was sustained. She said she was at Mercy every afternoon and "part evenings" during the period of her confinement. She never saw Mrs. Gillespie there. She denied that she told Mrs. Gillespie she could not come to the funeral. When the men (Woodruff and company) went to see her, she had no counsel, but she did try to tell them of the circumstances and tried to be honest with them. She did not know the will had to be probated, and she gave it to the men because they requested it. She voluntarily showed them the television set and rocking chair, and told Mr. Woodruff that these things had been removed to her house after Mrs. Smith's death. She said she also had a broken table of Mrs. Smith's stored in her attic. She did not close the apartment until after Mrs. Smith's death. She produced a cancelled check (presumably for rent) dated January 2, 1962, and signed by Mary J. Smith, which she had given the apartment manager. She said after Mrs. Smith's death and the closing of the apartment, she was in bed with the flu. The apartment manager got impatient concerning her moving the "things" out, and

he stored them in the basement. Some personal articles were given to the Salvation Army. She understood that a man from Kansas City was to get the three pictures, and they were left in the basement. No one bothered to call the apartment manager as a witness.

James Collison, son of plaintiff, testified as to the first acquaintance with Mrs. Smith, as related heretofore. He said Mr. Smith was living at the time. After that first encounter, he sometimes ran errands for them, such as carrying groceries and taking laundry to the laundromat, and once he helped clean the house when Mrs. Smith moved.

He said his mother was at the Smith apartment regularly a couple times a week over the last five or six years. He sometimes went with her. His mother helped Mrs. Smith with her groceries and clothes. After Mrs. Smith fell and hurt her back, his mother was there almost every day, sometimes twice a day. She fixed Mrs. Smith's meals, cleaned her up, and bathed her.

He had no discussion with Mrs. Smith about finances, but said Mrs. Smith said she was going to make sure "my mom got all she had after she died because she [his mother] could buy her a car and other things she needed." She offered to buy his mother a car but his mother refused because she didn't think Mrs. Smith could afford it. Mr. and Mrs. Smith had offered to pay Mrs. Collison for cooking, washing, and cleaning up, but she never accepted it. He said that Mrs. Smith had made the remark about wanting his mother to have everything she had when she died on the average of about once a week over the last two years. The trial court found this testimony "incredible and not worthy of belief."

On January 23, 1962, Mrs. Collison paid the funeral bill, in accordance with the contract made by Mrs. Smith (plus the cost of some flowers and the honorarium to the minister), by check on the account in the amount of $827.05, and by delivery of a

"social security check" in the amount of $77.00. On the same day, Mrs. Collison transferred the account to her own name.

The trial court made extensive findings of fact, too lengthy to be set forth here. Included were the findings that (a) the transfer was a gift, (b) a confidential relationship existed, (c) Mrs. Collison was active in procuring it, (d) the transfer was procured by means of undue influence. Judgment was rendered in favor of plaintiff for $10,485.69, which the court found to be the amount of the accounts *at date of death of Mrs. Smith,* plus an additional $175.15, representing a refund from Mercy Villa. The judgment also directed that the television set, rocking chair, end table, and three paintings be delivered to plaintiff.

■ We accord deference or "due regard" to those findings of fact of the trial court which are based upon sufficient evidence supplied by the spoken word of witnesses. Cooper v. Freer, Mo.App., 385 S.W. 2d 340(8); Norman v. Durham, Mo., 380 S.W.2d 296(2).

■ Various "presumptions" and rules in respect to "burden of proof" confront us. In the first place, plaintiff, having the affirmative at the outset, had the initial burden of proof. Secondly, the depositor's contract signed by the parties made a prima facie transfer of a present interest. Because of the necessary requirements of the business world, it is presumed that the parties intended what the depositor's contract provided [3] until it is shown that such contract was entered into by virtue of fraud, mistake, incapacity, or other circumstances which would vitiate it. Sections 362.470, 363.740 V.A.M.S.; Commerce Trust Co. v.

Watts, 360 Mo. 971, 231 S.W.2d 817; Connor v. Temm, Mo.App., 270 S.W.2d 541.

■ Perhaps because of the possible injustices worked by the dead man's statute, the courts have created some "presumptions." One of them is that, if services are performed by one not of the family and having no moral duty to perform them, such services are performed and received with expectation on both sides of payment of the reasonable value thereof. Steva v. Steva, Mo., 332 S.W.2d 924, and cases at 926, 927; Embry v. Martz' Estate, Mo., 377 S.W.2d 367(1). However, with respect to this "presumption" we apprehend that the services so rendered must be of such character and duration as would, in the mind of the ordinary reasonable person, imply expectation of payment. Thus a single or occasional errand or kind act would not necessarily imply expectation of payment, whereas extraordinary, onerous, or continued acts of service might well do so.

■ Then there is the presumption, or rather legal inference of fact, that if a *gift* is made to one standing in a confidential relationship with the donor, and if the donee is *active* in procuring or bringing about the specific transfer, these facts are sufficient to justify a finding of undue influence. Flynn v. Union National Bank of Springfield, Mo.App., 378 S.W.2d 1(13), and cases cited.

■ As to the finding of a confidential relationship: We think the evidence as we have related it was sufficient to justify the finding by the trial court that such existed. The defendant got the cards and took them to Mrs. Smith, and the cards were signed by both parties and returned by defendant

---

3. While this presumption is necessary, we have some doubts as to whether the average person, not familiar with banking, legal or business affairs, ever reads, or if so reading ever understands, the fine print depositor's contract on the back of the card (see In re Patterson's Estate, Mo., 383 S.W.2d 735, 739; Missouri Bar Journal [September 1965] p. 394). Banks *could* help to avoid misunderstandings by bringing in bold-face type, immediately above the signature, words such as "When one of the owners die, this account will belong to the survivor," or words of similar import.

on the same day. Thus the finding of "activity" on the part of the defendant is well-supported. It is suggested that the Flynn case (378 S.W.2d 1) is to the contrary, but in that case there was no evidence that the donee had anything to do with the card until after the donor had signed it.

We have more trouble with the question of whether or not this was a transfer for a valid consideration instead of a gift. However, the finding of the trial court was that the transfer was a gift and without consideration, and to this finding of fact we defer.

But we think the court's finding in respect to the transfer of the accounts is not necessarily inconsistent with any implied or presumed contract to pay the reasonable value of *services* performed or to be performed. The evidence is inadequate as to the extent and quantity of services rendered prior to the time Mrs. Smith fell and sustained injury, and we cannot and do not say from this record that such were of the character and sufficiency to raise any presumption of intention (implied contract) to pay therefor. But it is quite likely that the services performed after that time were of the character which normally would imply expectation of payment. Mrs. Smith was practically helpless and in need of considerable care, and Mrs. Collison supplied that care.

█ The evidence shows that Mrs. Collison, with, we think, Mrs. Smith's consent and approval and in accordance with Mrs. Smith's instructions, was paying the bills and debts for Mrs. Smith out of this account both before and after death—a situation not entirely unlike that in Weber v. Jones, 240 Mo.App. 914, 222 S.W.2d 957. As we have stated, Mrs. Smith was contemplating death and was making preparation for it. The depositor's agreement created a contract,

and Mrs. Collison took a present interest. In what capacity did she take? The same facts, in transaction of business and payment of bills, et cetera, which create the confidential relationship from which undue influence is to be inferred also create the relationship of principal-agent and, after transfer of funds, the relationship of trustee, as mentioned in Mathews v. Pratt, Mo., 367 S.W.2d 632.[4] We think the evidence justifies the conclusion that the transfers were made to Mrs. Collison as agent and actual or implied trustee for the purpose of enabling Mrs. Collison to pay her (Mrs. Smith's) expenses and her obligations as they should arise, both before and after death.

It would therefore seem that Mrs. Collison is to be charged with the amount of the funds so transferred but should also be credited with such amounts withdrawn, paid out, or withheld as represent payments or disbursals to accomplish that end in performance of the trust. This would, of course, include the funeral bill, medical expense bills (less any rebate credit), and any other lawful expenses or obligations of Mrs. Smith's, including any payment or withdrawals to pay for the value of services which were of such nature and character and period as would imply expectation of payment therefor, as has heretofore been mentioned.

The judgment of the trial court is based upon the amount of deposits as of date of death of Mrs. Smith and would therefore appear to exclude all credits for withdrawals or checks entered on the bank ledger accounts after that date. The judgment also charges Mrs. Collison with three paintings. We think the evidence is insufficient to show that she ever took such; but, since the case must be remanded in order to permit a determination of the credits to which Mrs. Collison is entitled,

4. See also State ex rel. Lee v. Sartorius, 344 Mo. 912, 130 S.W.2d 547; Brooker v. William H. Thompson Trust Co., 254 Mo. 125, 162 S.W. 187, 194; Kerber v. Rowe, 348 Mo. 1125, 156 S.W.2d 925, 927; Covey v. Van Bibber, Mo.App., 311 S.W.2d 112, 116; Swon v. Huddleston, Mo., 282 S.W.2d 18, 55 A.L.R.2d 205; Suhre v. Busch, 343 Mo. 679, 123 S.W.2d 8, 15–16.

the question of who got the paintings is left open for the production of additional evidence in that respect.

The judgment is affirmed in part, but it is remanded for the purpose of determining what credits the defendant is entitled to, and for such other proceedings as are not inconsistent with the views herein expressed.

STONE and HOGAN, JJ., concur.